**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William M. TROTTER, Defendant-Appellant.**

**No. 17437.**

United States Court of Appeals,
Seventh Circuit.

Oct. 27, 1970.

---

**114**

Thomas H. Morsch, Chicago, Ill., for appellant.

William J. Bauer, U. S. Atty., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., for appellee, Jeffrey Cole, Asst. U. S. Atty., of counsel, Assisted by Gary L. Starkman, Ford Foundation Intern.

Before SWYGERT, Chief Judge, KNOCH, Senior Circuit Judge, and KILEY, Circuit Judge.

KNOCH, Senior Circuit Judge.

Defendant-appellant, William Trotter, was convicted in a jury trial on a three-count indictment which charged Mr. Trotter and a co-defendant, Barney J. Brumbeloe (who pleaded guilty in a separate proceeding) with passing, uttering and publishing or possessing with intent to defraud, known counterfeit obligations of the United States in violation of Title 18, United States Code, § 472. This appeal followed.

On appeal, defendant-appellant contended (1) that counterfeit bills seized from him were improperly admitted into evidence because they were seized in a search incident to an unlawful arrest and (2) that the evidence adduced at the trial was insufficient to allow a jury's finding, beyond a reasonable doubt, that defendant possessed the requisite criminal intent.

Edward Hitchcock, who was then employed as a bartender at Vergie's Neighborhood Tap, a tavern on west Belmont Avenue in Chicago, testified that about 1:15 A.M. on March 16, 1967, he was alone in the premises when the defendant and a woman companion (later identified as Mrs. Luana J. Murphy) came in. He testified further that defendant paid for drinks with a $10 bill. He said he "didn't like it" and, later that he "didn't like the color of it" although he did make change for it. He said he telephoned his boss. He also followed the couple out to the street, saw the defendant throw some keys at a man sitting on the passenger side of a yellow 1967 Dodge station wagon (distinguished by lettering on its sides and ladders on the roof, but lacking license plates for which he looked) parked facing east in front of the next store. He watched the defendant, with his companion, walk east on Belmont. Mr. Hitchcock followed. After a few steps he saw defendant come back to the car. The woman got in and defendant spoke to the male passenger who

said "I'll shoot the son of a bitch" whereupon Mr. Hitchcock promptly departed. He saw all three leave in the car and then, observing a police squad car at Belmont and Damen, he spoke to the officer there. Another squad car came around the corner "on the call" and Mr. Hitchcock "jumped in". The squad car drove east on Belmont to Halsted Street but did not encounter the yellow station wagon and returned Mr. Hitchcock to the tavern.

Chicago Police Officer John J. O'Brien testified that on March 16, 1967 about 1:10 A.M. he received a radio message and proceeded down Irving Park east to Sheridan Road and then south looking for a 1967 Dodge yellow station wagon with green lettering on its sides and ladders on its roof, containing two white males and a lady. He later testified that a gun was mentioned in the message he received, but no gun was found. He sighted such a station wagon standing unoccupied on the northeast corner of Grace Street and Sheffield Avenue, parked his own car back of an alley from which he could see the station wagon, and made a radio call. After about 10 minutes he saw two white males and a young lady leave the Neighborhood Tap several doors away and walk towards the station wagon. He sent another radio message. The three entered the station wagon and proceeded north on Sheffield Avenue. Officer O'Brien followed until his assist squad car came up and pulled directly in front of the station wagon which stopped. Officer O'Brien left his car and went to the driver's side of the station wagon. The officer in the assist car, Officer Joseph F. Dieker, went to the passenger side. The defendant was driving. The two men were searched. Officer Dieker searched defendant. Officer Dieker also testified to receiving a call and proceeding to Dakin and Sheridan where he pulled in front of a yellow Dodge station wagon, ladders on top, then proceeding north on Sheridan. He described searching the defendant and finding two $10 bills which had the same serial number. Special Agent Axel I. Franzon of the United States Secret Service testified that these two bills were counterfeit. Shortly after the arrest Mr. Hitchcock came to the site and recognized the car and the persons who had been in it.

It is to the admission of these two counterfeit bills in evidence that defendant's objection is directed.

From this brief review of the testimony it is apparent that the arresting officers had reasonably trustworthy information sufficient to warrant a belief in one of reasonable caution that an offense had been committed by this. defendant to justify his warrantless arrest. United States v. Walker, 7 Cir., 1957, 246 F.2d 519, 526. The officers testified that they were looking for two white males with a lady in a clearly described distinctive vehicle. In Chambers v. Maroney, 1970, 399 U.S. 42, 46, 90 S.Ct. 1975, 26 L.Ed.2d 419, two witnesses described a blue compact station wagon bearing four men, one in a green sweater, seen speeding away from a parking lot close to a gas station which they then learned had been robbed. The victim described two robbers wearing respectively a green sweater and a trench coat. The data was broadcast and was held sufficient to justify arrest of the occupants of such a vehicle, one of whom wore a green sweater. The vehicle here was much more distinctively described. In Coleman v. United States, D.C.Cir., 1969, 420 F.2d 616, 619, 621, a broadcast message was held to be sufficient which described a vehicle as a U-Haul truck shaped like a Volkswagen bus and the possible occupants as four Negro males, one dark skinned, of heavy build with a large bushy mustache. See also Lewis v. United States, 1969, 135 U.S.App.D.C. 187, 417 F.2d 755 where a description of four Negro males in a green car seen leaving the site of a robbery was held sufficient to justify arrest of the four men walking away from such a car.

The defendant would distinguish these and similar cases on the ground that any layman can recognize such crimes as robbery but that only an expert can

detect a counterfeit bill. Here it was Mr. Hitchcock, admittedly not an expert, who entertained and acted on his suspicions of the bill given to him. To justify an arrest, however, as distinguished from the requisite quantum of proof of guilt at a trial, the misgivings of a bartender used to handling money, (and here also an identified complaining victim) was adequate to meet the needs of probable cause. Holt v. United States, 10 Cir., 1968, 404 F.2d 914, 919 fn. 5, cert. den. 393 U.S. 1086, 89 S. Ct. 872, 21 L.Ed.2d 779. When the police searched the defendant, actual currency taken from one of his pockets was carefully kept separate from the two counterfeit bills taken from another pocket. While the content of the various messages received by the policemen involved in the arrest was not given in evidence, it is apparent from the actions taken in response to those messages that the police officers knew of the complaint that counterfeit money had been passed.

Defendant stresses the facts that he and his two companions all lived in the neighborhood, had visited the Neighborhood Tap before and the co-defendant, at least, was known there, and that they were driving a distinctive vehicle, as all acting to negative the need to proceed without a warrant. However, their prior association with the neighborhood was not evidently known to the police nor the fact that they would make no attempt to flee arrest. Although the vehicle was distinctive and easily recognized, it was a moving vehicle. We do not believe that under the circumstances of this case the police officers were required to secure a warrant prior to making the arrest.

Defendant argues that in proving that he passed one bill at Vergie's Tap, another at the Neighborhood Tap, and was found in possession of two more, the government has not proved his guilt. Defendant and Mrs. Murphy (who had been with him that night) testified that the co-defendant who had been drinking, stumbled and fell getting out of the car and gave to defendant the bill which the latter passed to Mr. Hitchcock to buy cigarettes. Mrs. Murphy said she and defendant had drinks and bought cigarettes. This presented one of a number of issues of credibility for the jury as Mr. Hitchcock testified only to purchase of drinks. Defendant testified that he kept the change from the $10 bill given to Mr. Hitchcock. He also testified he started the evening with about $6 in currency and borrowed $10 (not in a single bill) from an acquaintance at the Maverick Tavern where he met the co-defendant and Mrs. Murphy. He said he was able to charge drinks he bought at the Maverick. That would make a total of about $24 which defendant had on his person. The arresting police officer, however, found $96 in currency in one of defendant's pockets: eleven $5 bills and forty-one singles. There were no bona fide $10 bills there. Mrs. Murphy testified that defendant threw the keys at the co-defendant so that the latter could drive himself while defendant took Mrs. Murphy home on a bus. The defendant testified that he was going to allow the co-defendant to drive a new company car just recently issued to defendant although the co-defendant's home was only a fifteen minute journey away while defendant himself took a bus. This explanation presented another issue of fact for the jury. Defendant had earlier testified that he lent this vehicle to the co-defendant for the evening but was to pick it up at the Maverick Tavern on Gordon Terrace at about 10 or 11:00 P.M. He said he did meet the other two there but that the co-defendant who was in a very inebriated state insisted on using the car further and that the defendant remained with him because the co-defendant was in no state to drive.

Defendant said they had played pool and started to drive to Cicero but returned and then visited Vergie's Tap.

Another conflict in testimony arose here as Mrs. Murphy testified that all three had stopped in several, seven or eight taverns, and that the co-defendant was driving. Defendant said co-defendant had nothing to drink between 11:00 and 1:15 when they arrived at Vergie's

Tap, but had fallen and had to be helped back into the car when he tried to leave it. Both defendant and Mrs. Murphy testified that the defendant decided against taking the bus and therefore returned to the car. They both saw Mr. Hitchcock on the street but both denied that any threats had been made to or about him. Defendant said they stopped at the Neighborhood Tap only because the co-defendant who was seated between him and Mrs. Murphy suddenly got out of the car when it was standing at a traffic light and that they then followed him into the tavern.

Abed Abu-Gheidars testified that he owned the Neighborhood Tap and that he was tending bar there from 11:30 until 2 A.M. He started his shift with no $10 bills in the cash register. He said he served a beer to the co-defendant, whom he had seen before, who paid with a $10 bill and who was joined by defendant and a girl (Mrs. Murphy); that defendant paid for subsequent drinks with another $10 bill. These two bills which were the only $10 bills he had that night proved to be counterfeit.

 It is defendant's position that Mr. Abu-Gheidars' evidence at the trial was completely discredited by the testimony of Ronald P. Alwin, counsel for the co-defendant, who stated that Mr. Abu-Gheidars had told him both bills were presented by the co-defendant. Similarly defendant refers to stipulated evidence concerning the report of Special Agent Roy Anderson in which he stated that both bills were passed by the co-defendant, and later in the same report that Mr. Abu-Gheidars thought it unusual that a patron would pay for one drink with a $10 bill and then present another for three more drinks. The same report also states that Mr. Abu-Gheidars recalled the event of the first $10 bill because it was folded in an unusual way and that, shortly after the couple joined the co-defendant, the defendant presented another $10 bill for the three drinks. The jury observed Mr. Abu-Gheidars on the witness stand. They had the benefit of testimony as to

prior inconsistencies in his statements. This was another in the series of issues of credibility presented for resolution to the triers of the facts in this case. We will not re-weigh the evidence and determine the credibility of the witnesses. United States v. Miles, 7 Cir., 1968, 401 F.2d 65, 67. Mr. Abu-Gheidars testified that both counterfeit bills were presented to him half-folded in the same way, presenting only one side of the bill which looked perfectly all right to him. When Officer Dieker found the two counterfeit bills in one of defendant's pockets, they too were folded over in half. The jury was adequately instructed and, viewing the evidence as a whole, we are satisfied that the jury was warranted in finding that defendant had specific criminal intent to pass counterfeit bills and had consciously done so.

Consideration of all other arguments and authorities advanced on behalf of the defendant leaves us, nevertheless, with the conviction that the judgment of the District Court must be affirmed.

The vigorous and skillful representation of the defendant-appellant by Mr. Thomas H. Morsch of the Illinois bar, as Court-appointed counsel, is greatly appreciated by this Court.

Affirmed.