**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert COVELLI, David Frederick and
Darwin Murray,
Defendants-Appellants.**

**Nos. 83–1846, 83–1880 and 83–1881.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1984.

Decided June 29, 1984.

Certiorari Denied Oct. 1, 1984.
See 105 S.Ct. 211.

848

Before CUMMINGS, Chief Judge, COF-FEY, Circuit Judge, and HENLEY, Senior Circuit Judge.*

HENLEY, Senior Circuit Judge.

Robert Covelli, David Frederick and Darwin Murray were convicted of various violations of federal law arising out of the robbery of a Chicago coin and jewelry shop and the subsequent disposition of the stolen goods in several different states. Specifically, under the Hobbs Act, 18 U.S.C. § 1951, Covelli was found guilty of committing robbery by means of force and violence. Along with codefendants Frederick and Murray, Covelli was also found guilty of transporting stolen goods in interstate commerce and with conspiracy to transport the stolen merchandise. *See* 18 U.S.C. §§ 2314, 371. In addition, Murray was convicted of making false and material declarations before a federal grand jury under 18 U.S.C. § 1623.

All three defendants appeal their convictions raising a variety of issues. Covelli contends that certain evidence should have been suppressed by virtue of his alleged unlawful arrest and detention by Seattle, Washington police. He also attacks certain evidentiary rulings made by the district court, contends that the government used impermissible closing argument, and challenges the sufficiency of the evidence in relation to his Hobbs Act conviction. Frederick and Murray make similar sufficiency of the evidence contentions with regard to their convictions. They assert that there is no theory of accomplice liability which can be used to properly convict them of the crime of transporting stolen goods from Illinois. Murray also contends that the count which charges false declarations before a grand jury is not specific enough and that the district court should have granted a mistrial when the government violated a court order. We affirm in part and reverse in part.

Cynthia Giacchetti, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Lee Schoen, Schoen & Smith, Robert S. Bailey, Paul Bradley, Chicago, Ill., for defendants-appellants.

* The Honorable J. Smith Henley, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation.

## I. BACKGROUND

On January 2, 1982 Princeton Auction Galleries, Ltd. (PAG), a jewelry store and coin shop located in Elmhurst, Illinois, was robbed of approximately $380,000.00 worth of jewelry, coins, and cash.[1] PAG's co-owner, Cynthia Princeton, was killed during the robbery. She was shot four times in the head, three times with a .25 caliber weapon and once with a .38 caliber weapon. The murder weapons were never found.

Robert Covelli, a "frequent" customer of PAG, came into the store near closing time three times during the week before the robbery. On each occasion he stayed only a short while and made no purchases. There was testimony that Princeton suspected Covelli of stealing jewelry from PAG. During the week before the robbery Princeton told several of her friends about her suspicions, and in the early afternoon of January 2, 1982 Princeton told Michele Gianola and Diana Louik that she was to meet with Covelli later in the afternoon to discuss the purchase of a diamond.[2]

The last known live contact with Princeton before the killing was a telephone call at approximately 4:30–4:45 p.m. on January 2. At approximately 5:20 p.m. a customer of the shopping center across the street from PAG noticed some coins behind her car and called the police. The police followed a trail of coins from the shopping center parking lot to PAG where they found Princeton's body lying behind a display counter. PAG's guard dog was found unharmed and cowering in a back office. From the location of the empty cartridges and the blood pattern, a "blood splatter" expert testified that the gunman shot Princeton while standing in a hallway behind the display cases. There was testimony that Robert Covelli was one of only a few persons who could go behind the display counters without being attacked by the dog.

At approximately 6:15–6:30 p.m. on the day of the robbery/murder, Robert Covelli entered Uncle Don's Saloon in Chicago and was subsequently joined by his brothers, Scott and Michael. Covelli purchased some cassette tapes from the bartender and paid for them in cash. The bartender testified that Covelli pulled out a large roll of $100 bills and that Covelli stated that he had about $4,000.00 to spend and that he was going to Las Vegas. At approximately 8:30 p.m. Robert and Scott Covelli went to their parents' home and told their mother that they were going out of town. Neither of the men took any clothing or luggage with him and neither told the family where he was going. At about 11:00 p.m. that night, using reservations made in the names of R. Frederick and S. Frederick, the two brothers took a United Airlines flight from O'Hare Airport to Seattle, Washington. Before leaving, however, Robert Covelli called Detective Schak of the Chicago Police Department. Covelli had previously testified for the state in a homicide trial. Schak testified that Covelli asked him what the defendant in that case had received as a sentence.

Digressing for a moment, David Frederick's contact with Robert Covelli will be mentioned. Frederick was a friend of Covelli's who lived in Pasco, Washington. Telephone records established that, during the week before the robbery, collect calls were placed from bars frequented by Covelli to Frederick's home in Pasco. Similar calls were also made at about noon and 10:05 p.m. on the day of the robbery. There was no evidence as to the contents of any of these conversations.

The Covellis arrived in Seattle, Washington at approximately 1:00 a.m. on January 3. A telephone call to Frederick's residence was made at about 1:30 a.m. from a coin phone at the motel where the Covellis

---

1. The stolen cash included approximately $6,000.00 in $100 bills.

2. Princeton suspected Covelli of stealing a diamond ring from the store. She asked Covelli for a diamond similar to the one contained in the ring in the hope that he would bring back the stolen diamond. Gianola and Louik testified that Princeton stated that, if he returned with the diamond, she planned to take the diamond and confront him.

spent the night. Another call was made to Frederick's home the next morning from the airport in Seattle.

While at the Seattle Airport Robert Covelli went into a store and purchased some clothing with three $100 bills. The store clerk suspected that one of the bills was counterfeit and called the police.[3] Covelli approached one of the officers investigating the alleged counterfeit currency and asked the officer for directions. Since Covelli matched the description given by the store clerk, the officer asked Covelli about an event that occurred in the clothing store. Covelli responded "What's wrong? Was the money bad?" even though the officer had not mentioned money. At that point Covelli was taken into custody, strip-searched, and placed in a cell. Covelli consented to a search of his luggage and, in the course of the search, the officers observed coins, rolls of coins, and a large amount of jewelry. In addition, $4200.00 in $100 bills and other jewelry matching items stolen from PAG were found on his person. Before the search of the luggage was completed, however, the officers were notified by the Secret Service that the bill in question was not counterfeit. The officers then returned Covelli's possessions and released him. Thereafter, the Covellis flew to Pasco, Washington and went to David Frederick's residence.[4]

The defendant Darwin Murray is a friend of Frederick's who lives in a town near Pasco. Murray's first contact with Robert Covelli was in October of 1981 when Frederick introduced him to Covelli in Pasco. Covelli offered to pay all expenses if Murray would fly the group to Reno, Nevada to do some gambling. Subsequently, Frederick, Covelli, Murray and his wife flew to Reno in Murray's airplane and spent a few days gambling. Murray testified that

thereafter he did not see Covelli until the first week in January, 1982.

Murray testified before the grand jury that Frederick contacted him in early January, 1982 regarding flying to a football game in San Francisco, California. He stated that he was asked by Covelli and Frederick if he knew anyone who would buy gold. Murray mentioned James David Poole. Poole is one of Murray's relatives who runs a jewelry business in Oakland, California. Poole testified at trial that Murray called him in the first week in January, 1982 and asked him if he knew anyone who would be interested in buying a large amount of jewelry. Murray told Poole that the jewelry came from a distress sale back East and was worth approximately $300,000.00 wholesale, but that they would be willing to take much less. Subsequent telephone calls to Poole regarding the sale of jewelry were made from Frederick's residence.[5]

On January 8, 1982 Murray chartered an airplane and flew to Sacramento, California with Robert Covelli, Scott Covelli and David Frederick. Poole testified that Murray and Frederick called him several times asking him to get in touch with his buyer. Poole told them that the buyer was out of town and further efforts to sell the jewelry in Sacramento were unsuccessful. The next morning the group flew to Reno, Nevada where Murray's friend, Mead Walker, picked them up at the airport and drove them to a motel.

Walker testified that, while having a drink in the motel lounge, Frederick told him that Robert Covelli had some jewelry for sale that Covelli had acquired over a period of time as payment for brokerage fees. There is some dispute about whether Murray was a party to this conversation

---

3. The bill in question did not have "In God We Trust" printed on it, was new and crisp, and its coloring appeared unusual.

4. There was evidence that, after the Covellis arrived, Frederick brought ten to twelve diamond rings bearing price tags to work and sold one to his foreman. The ring was later identified as having come from PAG.

5. It appears that Murray made the initial call to Poole and then introduced Frederick to Poole over the phone. Subsequent calls were made by both Frederick and Murray. Poole's testimony is unclear as to how many of the phone calls were made by Murray. Poole was also unsure as to the dates of the calls.

since, although all three were seated together, Murray was apparently watching a football game on the lounge television. The next morning Walker arranged a meeting between Robert Covelli, Frederick and Jay Ferguson, the owner of Jay's Jewelry. However, after seeing the jewelry and the way it was carried, Ferguson refused to go through with the purchase. Frederick allegedly told Ferguson, "It's hot, but it's not hot here." It appears that at least some of the jewelry was subsequently sold at a pawn shop in Reno.

The group then left Reno and flew back to Pasco, Washington that evening. Although Robert Covelli returned to Chicago, Scott Covelli remained in Pasco and sold four pieces of jewelry to a coin shop in Kennewick, Washington. Two of these pieces were identified as having come from PAG.

Murray was subpoenaed before a federal grand jury in February, 1982. Murray testified that the purpose of the flight to Sacramento was to go to a football game but that, when they were unable to get tickets, they decided to go to Reno to gamble. Murray testified that Robert Covelli carried a briefcase during the trip but that he was told it contained an antique. Murray stated he did not know what it contained since he never saw the inside of the briefcase. He further testified that there were no discussions regarding selling any jewelry on the trip.

On July 7, 1983 FBI Agent Shelton arrested Murray in Washington. Agent Shelton testified that after the arrest Murray stated that he had told the truth in his testimony before the grand jury. However, Murray admitted that he had initially contacted Poole in order to sell the jewelry, that he had opened Covelli's briefcase at one point during the trip and observed a sock loaded with jewelry, and that, during the flight to Sacramento, he had a feeling that the jewelry "might be hot."

6. Scott Covelli was tried as a codefendant for conspiracy and transporting stolen goods. The

At trial, Covelli undertook to show that he and Princeton had an agreement whereby she would steal jewelry from PAG and he would try to sell it for her. According to Covelli, Princeton was having difficulties with the other owner, Roy Clemens. Covelli testified that he went to PAG during the week before the robbery to pick up a large amount of jewelry to take to the West Coast but that someone was in the store each time and Princeton was unable to give it to him. Covelli stated that when he went to PAG on the day of the robbery Princeton gave him a large amount of jewelry and expense money. Covelli claimed to be unaware of the murder until he got to Washington.

After a month-long jury trial, Robert Covelli was convicted of Hobbs Act robbery, transporting stolen goods in interstate commerce, and conspiracy. He received consecutive sentences of twenty years imprisonment, five years imprisonment and five years probation. Frederick and Murray were both convicted of conspiracy and the substantive offense of transporting stolen goods. In addition, Murray was convicted of making false statements to a federal grand jury. Frederick was sentenced to consecutive terms of five years imprisonment on the substantive count and five years probation on the conspiracy count. Murray was sentenced to one year and one day imprisonment on each of the perjury and conspiracy counts, sentences concurrent, and five years probation on the transporting stolen goods count, the latter sentence to run consecutive to his sentences on the other two counts.[6]

## II. DISCUSSION

Robert Covelli

*Search and Seizure.* Covelli contends that certain evidence, specifically the observations made by the arresting officers during the consent search at the Seattle Airport as well as Covelli's post-arrest statements, should have been suppressed. He

jury found him not guilty.

alleges that his consent to search the luggage was vitiated by the illegal warrantless arrest. He concedes that the officers had a reasonable suspicion that he was involved with counterfeit currency, but that the detention involved here went beyond a limited *"Terry* stop" and hence the detention was illegal unless the officers possessed probable cause. He further alleges that the police lacked probable cause to arrest him and that the evidence must therefore be suppressed.

We agree with Covelli that the detention which took place here certainly went beyond the limits of a *Terry* stop. The officers took Covelli into custody, read him his *Miranda* rights, strip-searched him, and placed him in a cell. This can hardly be considered a "short lived and minimal" intrusion. *See Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 1335, 75 L.Ed.2d 229 (1983) (Blackmun, J., dissenting). At the time Covelli gave consent for his luggage to be searched, he was clearly in custody and under arrest. *See Dunaway v. New York*, 442 U.S. 200, 213–16, 99 S.Ct. 2248, 2257–59, 60 L.Ed.2d 824 (1979); *cf. Immigration & Naturalization Service v. Delgado*, — U.S. —, — - —, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984); *United States v. Black*, 675 F.2d 129, 133–35 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983) (mere questioning without detention not an arrest). Therefore, Covelli's arrest and detention can be considered proper only if it was based upon probable cause.

■ The district court concluded that the officers in fact had probable cause to arrest Covelli under both the fourth amendment and the law of Washington.[7] Because the trial court had the opportunity to assess the credibility of the witnesses to the arrest, we will not overturn its findings unless they are clearly erroneous. *United States v. Mattes*, 687 F.2d 1039, 1042 (7th

Cir.1982); *United States v. Ganter*, 436 F.2d 364, 368 (7th Cir.1970). The police have probable cause to arrest an individual where "the facts and circumstances within their knowledge and of which they [have] reasonable trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *United States v. Jones*, 696 F.2d 479, 486 (7th Cir.1982), *cert. denied*, — U.S. —, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 2335 n. 13, 76 L.Ed.2d 527 (1983). The determination of whether probable cause exists in a given situation involves "the factual, practical considerations of everyday life upon which reasonable, prudent [persons], not legal technicians act." *United States v. Watson*, 587 F.2d 365, 368 (7th Cir.1978), *cert. denied, Davis v. United States*, 439 U.S. 1132, 99 S.Ct. 1055, 59 L.Ed.2d 95 (1979).

■ The information which the officers possessed at the time of Covelli's arrest included the fact that he had purchased some clothing in an airport shop with three $100 bills. The store clerk noticed that one of the bills was substantially different than the other two. It was new and crisp, was an unusual color, and did not bear the words, "In God We Trust." The police officer summoned by the clerk also concluded that the bill looked counterfeit. Finally, when the arresting officer asked to talk to Covelli about something that had happened in the store, Covelli immediately responded, "What's wrong? Was the money bad?" even though the officer had not mentioned money. It is undisputed that

---

7. The district court stated that in the absence of an applicable federal statute, the law of the state where an arrest takes place determines its validity. The court cited *Hopper v. United States*, 267 F.2d 904, 907 (9th Cir.1959), for this proposition. However, the court also stated that the Washington law of arrest is essentially the same as federal constitutional standards. The parties have accepted this conclusion and we will therefore examine Covelli's arrest in the context of general fourth amendment safeguards.

this statement was given before Covelli was placed under arrest. Based upon this information, we believe that the arresting officer had sufficient cause to believe that Robert Covelli had passed a counterfeit bill. The bill was distinctive enough to cause two people, a store clerk familiar with handling money and a police officer, to conclude that the bill was counterfeit.[8]

In a somewhat analogous situation dealing with the arrest of an alleged counterfeiter, we stated that "[t]o justify an arrest ... the misgivings of a bartender used to handling money, (and here also an identified complaining victim) was adequate to meet the needs of probable cause." *United States v. Trotter*, 433 F.2d 113, 116 (7th Cir.1970), *cert. denied*, 401 U.S. 942, 91 S.Ct. 950, 28 L.Ed.2d 224 (1971).[9] Covelli's response when asked about an event that took place in the store certainly added to the officer's suspicions since it was reasonable to infer some consciousness of guilt from Covelli's statement. The fact that the bill was eventually found to be legitimate does not detract from our conclusion for it is the information possessed by the officers at the time of the arrest which must be scrutinized. *See, e.g.*, 1 W. LaFave, *Search and Seizure* § 3.2(d), at 465–66 (1978). We therefore uphold the district court's finding that the police had probable cause to arrest Covelli at the time he was taken into custody. Determination as to whether Covelli's consent was tainted by the arrest thus is unnecessary.

■ *Evidentiary challenges.* Covelli next argues that the district court erred in making certain evidentiary rulings. In reviewing these contentions, we keep in mind "that the district court has broad discretion to assess the relevancy of proffered evidence." *United States v. West*, 670 F.2d 675, 682 (7th Cir.), *cert. denied*, 457 U.S. 1139, 102 S.Ct. 2944, 2972, 73 L.Ed.2d 1340, (1982). Most, if not all, of Covelli's contentions in this regard go to questions of admissibility under FRE 403 [10] and FRE 404(b).[11] We give great deference to the evidentiary rulings of the district court for "trial judges are much closer to the pulse of a trial than we can ever be.... " *United States v. Juarez*, 561 F.2d 65, 71 (7th Cir.1977); *see also United States v. Serlin*, 707 F.2d 953, 959 (7th Cir.1983); *United States v. Baskes*, 649 F.2d 471, 481 (7th Cir.1980), *cert. denied*, 450 U.S. 1000, 101 S.Ct. 1706, 68 L.Ed.2d 201 (1981). We will not reverse a ruling on the admissibility of evidence unless it appears that the court clearly abused its discretion. *E.g., United States v. Solomon*, 688 F.2d 1171, 1178 (7th Cir.1982).

■ Covelli contends that the district court erred in allowing the government to introduce excessive evidence relating to the murder of Cynthia Princeton. This evidence consisted primarily of testimony regarding the murder scene, the murder weapon, the location of the gunman, and a stipulation as to the autopsy results.[12] He relies heavily on *United States v. Ostrowsky*, 501 F.2d 318 (7th Cir.1974), to support

---

**8.** The bill in question turned out to be one from a 1937 series, most of which are out of circulation.

**9.** Covelli points out that neither the store clerk nor the officer who observed the bill had any particular expertise in detecting counterfeit currency. This same type of contention was considered and rejected in *Trotter*, 433 F.2d at 115–16. Although such considerations are certainly relevant, they are by no means dispositive.

**10.** FRE 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**11.** FRE 404(b) provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**12.** Relatedly, Covelli contends that the government unduly emphasized Princeton's murder in closing argument. We will deal with this particular contention later in the opinion.

his position that this evidence deprived him of a fair trial. In *Ostrowsky*, this circuit reversed a conviction for interstate transportation of a stolen automobile under the Dyer Act, 18 U.S.C. § 2313, because the government was allowed to introduce "a great amount of evidence pertaining to the murder [of the stolen automobile's owner] that was unnecessary." *Ostrowsky*, 501 F.2d at 323.

However, *Ostrowsky* does not dictate reversal here. First, in order to secure a conviction under the Hobbs Act, the government is required to show that actual or threatened force or violence was used in the robbery. *See* 18 U.S.C. § 1951. Thus, some evidence of Princeton's murder was necessary to establish an element of the crime.[13] Indeed, it is difficult to imagine how the government could prove this element without at least some proof of the victim's demise. In the usual Hobbs Act case, the government introduces the victim's testimony as to the use or threat of force. Here, of course, the only witness to the crime was unavailable. In addition, we note that the murder was one of the overt acts charged in the conspiracy count. Since the evidence was directly relevant to proving essential elements of the crimes charged, it could be said this was simply not "other crimes" evidence. *See United States v. West*, 670 F.2d at 688.

In any event, unlike the situation in *Ostrowsky*, the court consistently allowed only necessary evidence to be introduced and ruled that "gory details" of the murder could not be admitted. No photographs of the victim or the crime scene were seen by the jury and the court specifically noted in the record that the murder evidence elicited no reactions from the jury that would indicate unfair prejudice to Covelli. It is clear that the district court carefully balanced the evidence in terms of its probative value and prejudicial effect. On balance we are persuaded that the district court did not abuse its discretion in admitting this evidence.

Covelli also contends that the district court erred in allowing two witnesses to testify regarding his past possession of a small caliber pistol. The first witness, Michele Gianola, recalled that while Covelli was in PAG in May of 1981 he tapped the side of his boot and stated, "I've got an equalizer that makes me as big or bigger than anyone." The second witness, Rebecca Evans, testified that while living with Covelli in 1978 she saw him possess a small gun. Covelli alleges that the probative value of this testimony was substantially outweighed by its prejudicial effect.

The district court specifically addressed this contention and ruled that the evidence was admissible under FRE 404(b) as probative of Covelli's possible possession of the murder weapon, his opportunity to commit the crime, and the ultimate identification of him as the robber. The court also ruled that the probative value of this testimony was not substantially outweighed by unfair prejudice to the defendant under FRE 403. Covelli's principal argument is that this evidence was not relevant since it did not relate to weapons seized at the time of arrest and that the Princeton murder weapons were never found. However, evidence of prior possession of a weapon can be used to prove opportunity and identification even where it cannot be directly identified as the weapon used in the crime. *See*

---

13. In contrast, the murder evidence in *Ostrowsky* was only "tangentially" related to proving an element of the Dyer Act violation. *Ostrowsky*, 501 F.2d at 321. Moreover, the murder evidence here was also relevant in proving the identity of the robber under FRE 404(b). Covelli denied complicity in the murder and thus circumstantial evidence pertaining to Princeton's death was necessary to prove both the fact of physical violence and that it was Covelli who accomplished the act. *Cf. Ostrowsky*, 501 F.2d at 323 (defendant admitted murdering victim so that evidence regarding details of the murder was unnecessary). The testimony relating to the location of the body and the wounds which caused Princeton's death allowed an expert to give the opinion that the gunman was behind the display cases when he killed the victim. The location was important in establishing identity since other testimony established that Covelli was one of only a few persons who could go behind the display cases without being attacked by the guard dog.

*Government of Virgin Islands v. Joseph,* 685 F.2d 857, 860–61 (3d Cir.1982); *United States v. Miroff,* 606 F.2d 777, 781 (7th Cir.), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1979).[14] This is not a case where there is no independent evidence relating the use of a weapon to the commission of the crime since it is undisputed that Princeton was shot with both a .25 caliber and a .38 caliber gun. *Cf. United States v. Reid,* 410 F.2d 1223, 1227 (7th Cir.1969) (weapon evidence only admissible where there is independent evidence relating use of weapon to commission of the crime). The district court did not clearly abuse its discretion in admitting this testimony.

■ Detective Schak of the Chicago Police Department was allowed to testify that Robert Covelli phoned Schak from O'Hare Airport on the night of the robbery. The relevant aspect of the conversation was Covelli's inquiry into the sentencing of a Robert Jansen. Jansen had been convicted of murdering a young woman and Covelli had been a witness for the state in Jansen's trial. Covelli contends this testimony was inadmissible under FRE 404(b) since it created an inference of Covelli's "propensity" to commit a similar crime. He also asserts FRE 403 as a ground for exclusion.

We do not find that the admission of this testimony constitutes reversible error. First, this was not "propensity" evidence since no testimony was elicited that Covelli was accused of the crime or was in any way an accomplice of Jansen. As for its relevancy, the government argues that the evidence was probative of Covelli's anxious state of mind on the day of the robbery. In other words, the government hoped that the jury would infer that Covelli was concerned about the possible penalties given murderers since he himself had committed

a murder. Arguably, this inference was not an improper consideration for the jury. But in any event, even assuming error in the admission of the testimony, Schak's testimony was brief, limited and of so little importance that viewing the record as a whole, we do not find it deprived Covelli of a fair trial. *See* Fed.R.Crim.P. 52(a); *United States v. Jordan,* 722 F.2d 353, 357 (7th Cir.1983).

■ The final contested evidentiary ruling concerns the government's cross-examination of Robert Covelli. The district court permitted the government to impeach Covelli by inquiring into the fact that in 1979 he told Detective Schak that he had faked an insanity defense to a prior burglary charge and was subsequently found incompetent to stand trial. Covelli contends this was unfairly prejudicial and should not have been allowed.

Covelli put his credibility at issue when he took the stand. The Federal Rules of Evidence clearly allow a witness to be impeached with prior instances of conduct probative of truthfulness or untruthfulness. *See* FRE 608(b)(1); *United States v. Reid,* 634 F.2d 469, 473–74 (9th Cir.1980), *cert. denied,* 454 U.S. 829, 102 S.Ct. 123, 70 L.Ed.2d 105 (1981). Covelli's statement that he had falsified a defense in a criminal case falls within the scope of the rule and no extrinsic evidence was introduced on the issue. Although this type of impeachment may nevertheless be excluded under Rule 403, here the jury was already aware of Covelli's criminal record through other testimony, and therefore no undue prejudice appears from the record. It was not an abuse of discretion to allow this form of impeachment.

Covelli's contention that the government exceeded the scope of proper closing argument is also without merit. In making this

**14.** Covelli contends that these cases are distinguishable because of the length of time between the past possession and the crime, here seven months between Covelli's statement to Gianola and the robbery and over three years between Evans' observations and the crime. Although we are somewhat troubled by the time element since a great deal of time between the prior

possession and the commission of the crime reduces its probative value, defense counsel certainly had the opportunity to explore the matter in cross-examination and we do not believe that the testimony's probative value was so diminished as to tip the 403 balance in favor of exclusion.

allegation, Covelli provides only conclusory references to the government's presentation and contends generally that the government unduly emphasized Princeton's murder. The only specific improper statement alleged is that government counsel stated that "for the next few moments, I am going to try to represent ... Cindy Princeton."

A government attorney "may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." *United States v. West*, 670 F.2d at 688 (*quoting Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)). No "foul blows" were struck here. The government's remark about representing Princeton and its related argument was in direct response to defense counsel's argument that Princeton and Covelli were in league together to steal from PAG. An "invited response is a proper subject of closing argument." *Id.* Moreover, the prosecution does not appear to have unnecessarily dwelled on Princeton's murder. We have carefully reviewed the summations presented to the jury, particularly in light of Covelli's claim of improper evidentiary emphasis on the murder, and have found no reversible error.

Covelli's final contention is that the evidence was insufficient to support his conviction for robbery under the Hobbs Act. In reviewing this contention, we must view the evidence in the light most favorable to the government in order to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *E.g., Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Moya*, 721 F.2d 606, 610 (7th Cir.1983). We may not reweigh the evidence or assess the credibility of witnesses, *see United States v. Washington*, 586 F.2d 1147, 1152 (7th Cir.1978), and the jury's verdict must be upheld if there is substantial evidence to support it. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct.

457, 469, 86 L.Ed. 680 (1942); *United States v. Jordan*, 722 F.2d at 359.

Covelli stresses that there were no eyewitnesses to the crime and that his fingerprints were not found at PAG. However, it is clear that there was enough circumstantial evidence presented to warrant submission of the case to the jury and to support the verdict on the Hobbs Act count. During the week before the robbery Covelli came into PAG several times in an attempt to find Princeton alone. Two witnesses testified that Princeton intended to confront Covelli about stealing from PAG on the day of the robbery. Princeton was shot from behind a display case, a position which Covelli could take without having to kill the guard dog. She was shot three times with a .25 caliber pistol (and once with a .38 caliber weapon) and two witnesses testified that Covelli had possessed a small gun in the past. Covelli was seen with a large amount of money soon after the murder and immediately purchased tickets under false names to fly to Washington. In Seattle, Covelli was found to be in possession of a great amount of jewelry and coins by the airport police and some of this jewelry was later identified as having come from PAG. Although this is certainly not all the evidence which implicates Covelli, further citation to the record is unnecessary.

In sum, we have carefully considered all of Covelli's arguments and find them to be without merit. We therefore affirm his convictions.

### David Frederick and Darwin Murray

*The Substantive Count.* Count Three of the indictment charged all three defendants with the substantive offense of transporting stolen goods in interstate commerce. Both Frederick and Murray contend that their convictions under this count must be reversed because the evidence is insufficient to establish that they were involved in transporting the stolen jewelry from Illinois. They allege that the transportation from Illinois to Washington was accomplished by the Covelli brothers, and that while they may have been involved in the

subsequent transportation from Washington to California and Nevada, their participation in any earlier stages is totally speculative. They assert that there is no theory of accomplice liability which can be used to connect them with the transportation of the goods from Illinois. The government contends that *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), provides the requisite theory of liability and that the evidence is sufficient to support the challenged convictions. We reject the government's arguments and reverse the convictions of Frederick and Murray under Count Three.

■■■ We begin with the precise charge contained in the indictment. Count Three charges defendants with the interstate transportation of stolen goods *from Illinois* to Washington, California and Nevada.[15] This is a substantive offense which is separate and apart from the conspiracy count. This distinction is important since guilt of a substantive crime is governed by concepts of accomplice liability. *See, e.g., United States v. Greer*, 467 F.2d 1064, 1068–69 (7th Cir.1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973).

There are basically two theories of accomplice liability which are arguably applicable here. The first theory is that espoused in *Pinkerton*. There, the Supreme Court "held that evidence of being part of a conspiracy would be sufficient to support conviction on substantive offenses committed in furtherance of the conspiracy." *United States v. Varelli*, 407 F.2d 735, 749 (7th Cir.1969). The second theory is to hold defendants liable as aiders and abettors. Under 18 U.S.C. § 2, they could then be punished as principals. Justice Douglas explained the distinction between the two theories:

> The rule of [*Pinkerton*] does service where the conspiracy was one to commit offenses of the character described in the substantive counts. Aiding and abetting has a broader application. It makes a defendant a principal when he consciously shares in any criminal act whether or not there is a conspiracy. And if a conspiracy is also charged, it makes no difference so far as aiding and abetting is concerned whether the substantive offense is done pursuant to the conspiracy. *Pinkerton v. United States* is narrow in its scope. Aiding and abetting rests on a broader base; it states a rule of criminal responsibility for acts which one assists another in performing.

*Nye & Nissen v. United States*, 336 U.S. 613, 620, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949).

Under *Pinkerton*, "[o]nce the conspiracy and the defendant's knowing participation in it have been established beyond a reasonable doubt, the defendant will be vicariously liable for the substantive acts committed in furtherance of the conspiracy by his coconspirators." *United States v. Sampol*, 636 F.2d 621, 676 (D.C.Cir.1980); *see also United States v. Smith*, 680 F.2d

---

**15.** The precise wording of the charge is as follows:

COUNT THREE

The FEBRUARY 1982 GRAND JURY further charges:

From on or about January 2, 1982, to on or about January 12, 1982 in the Northern District of Illinois, Eastern Division and elsewhere,

ROBERT FRANK COVELLI,
SCOTT COVELLI,
DAVID FREDERICK, and
DARWIN MURRAY,

defendants herein, did transport and cause to be transported in interstate commerce from Elmhurst, Illinois, in the Northern District of Illinois, to Seattle, Washington; Pasco, Washington; Sacramento, California; and Reno, Nevada, certain goods, wares, merchandise, and money of a value of $5,000 or more, to wit: Various jewelry, coins, gems, gold, currency and other goods stolen from P.A.G. Ltd., 933 South York Road, Elmhurst, Illinois, knowing the same to have been stolen;

In violation of Title 18, United States Code, Section 2314.

The government, of course, could have avoided this entire issue had it charged Frederick and Murray with the interstate transportation of stolen goods from Washington to California and Nevada. However, having charged Frederick and Murray with the transportation from Illinois, the government must provide some evidence connecting defendants to this phase of the illegal enterprise.

255, 261 (1st Cir.1982), *cert. denied,* 459. U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983); *United States v. Garcia,* 655 F.2d 59, 62 (5th Cir.1981). The government argues that, since Frederick and Murray's participation in the conspiracy has been established, they can be held vicariously liable for the transportation of the stolen goods from Illinois. However, "[t]o convict on this basis would be to establish criminal guilt by ratification, which is not a criminal-law doctrine." R. Perkins & R. Boyce, *Criminal Law* 704–05 (3d ed. 1982). We have previously stated the distinction that "[a]lthough joining a conspiracy subjects the late joiner to some of the consequences of earlier activity by others in furtherance of the conspiracy, ... an individual 'cannot be held criminally liable for substantive offenses committed by members of the conspiracy before that individual had joined or after he had withdrawn from the conspiracy....'" *United States v. Knippenberg,* 502 F.2d 1056, 1059 (7th Cir.1974) (*quoting Levine v. United States,* 383 U.S. 265, 266, 86 S.Ct. 925, 926, 15 L.Ed.2d 737 (1966)); *accord United States v. Freeman,* 498 F.2d 569, 575 (2d Cir.1974); *Glazerman v. United States,* 421 U.S. 547, 551 (10th Cir.), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1817, 26 L.Ed.2d 90 (1970); *Gradsky v. United States,* 376 F.2d 993, 996 (5th Cir.), *cert. denied,* 389 U.S. 908, 88 S.Ct. 224, 19 L.Ed.2d 505 (1967).[16] *Contra United States v. Michel,* 588 F.2d 986, 1002 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979) ("When one knowingly joins a conspiracy in progress he is responsible for acts of the conspiracy occurring before or after his association with it."). Thus, in order for Frederick and Murray to be liable for the transportation from Illinois to the other states involved, the government must show that they joined or were involved in the conspiracy sometime prior to the Washington flight of the Covelli brothers on January 2, 1982.

The government asserts that Frederick's involvement in the conspiracy prior to January 2, 1982 is established by the evidence of telephone calls between Covelli and Frederick during the week before the robbery and by the testimony of Robert Boles. Boles testified that Frederick told him that he was involved in a deal in Chicago in which he stood to make several hundred thousand dollars.

Even viewing the evidence and all reasonable inferences in the light most favorable to the government, we do not believe Frederick's conviction under Count Three can be sustained. All that the telephone records establish is that collect calls were made from phone booths in Elmhurst, Illinois, to Frederick's Pasco, Washington, residence or business phones during the week before the robbery. In most instances the evidence does not disclose the identities of the parties to the conversations. Even allowing the government the inference that these communications were between Covelli and Frederick, what was said in the conversations is left to sheer speculation. It is conceivable that the two were discussing the planned robbery and the subsequent disposition of the goods. However, it is just as likely that Covelli did not tell Frederick of the robbery until after he arrived in Washington. Since Frederick and Covelli had an antecedent relationship exemplified by previous visits to Washington, the phone calls may have been made by Covelli to let Frederick know that he was coming to Washington for a social visit. We simply have no way of knowing what the subjects of these conversations were. We are similarly unpersuaded by Boles' testimony. Boles testified that Frederick made the incriminating statement in "the later part of '81, early '82, December, January, in that area." However, Boles later testified that he did not really remember when the conversation occurred and stated that it occurred around "tax time." "Tax time" could be considered any time from Decem-

---

**16.** In contrast, one can be convicted of conspiracy and be held liable for all the overt actions of other conspirators which were intended to advance the scheme, even actions which occurred before that particular person joined the conspiracy. *See, e.g., United States v. Lynch,* 699 F.2d 839, 842 n. 2 (7th Cir.1982).

ber to April. From this evidence the government urges us to draw the conclusion that the conversation occurred prior to January 2, 1982. In view of Boles' demonstrated inability to narrow the date of the alleged conversation to any less than a two-month period of time, however, we decline to do so. Even though the government is entitled to all reasonable inferences which can be drawn from the evidence, we are free to reject the leaping assumptions it asks us to make here. In short, we do not believe that the government's presentation constitutes "substantial evidence" that Frederick was a member of the conspiracy prior to January 2, 1982.

The evidence presented in regard to Murray's participation in the conspiracy prior to this date is even less convincing. The evidence consists of a series of phone calls between Covelli and Frederick, Frederick and Murray, and Murray and Poole. These phone records suffer from the same infirmity previously discussed. Even assuming or inferring that defendants were the parties to these conversations, we are left to speculate as to what was said. Although it appears Frederick called Murray on December 30, 1981, soon after he spoke with Covelli, Murray did not communicate with Poole regarding any sale of jewelry until January 3, 1982 at the very earliest.[17] The conclusion we are asked to reach by the government requires us to pile inference upon inference, using little more than unverified suppositions. We do not believe any rational trier of fact could conclude beyond a reasonable doubt that Murray

was a part of the conspiracy prior to the Covellis' arrival in Washington.

In sum, on this record we cannot fully justify the convictions of Frederick and Murray for interstate transportation of stolen goods. We, therefore, reverse those convictions under Count Three of the indictment.[18]

■ *The Conspiracy Count.* Murray also insists that his conviction for conspiracy to transport stolen goods in interstate commerce must be reversed because the government failed to prove that he knew that the property in question was stolen. In assessing the sufficiency of the evidence in this regard, we must, of course, view the record in the light most favorable to the government. *See, e.g., United States v. Redwine,* 715 F.2d 315, 319 (7th Cir.1983).

*United States v. Xheka,* 704 F.2d 974, 988–89 (7th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983), sets forth the general rules governing our decision:

Participation in a criminal conspiracy may be shown through circumstantial evidence. Circumstantial evidence may include whether the defendant has a stake in the outcome of the conspiracy. Once a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict. Most important to this case is the well-established rule that mere association, knowledge or approval of a conspiracy is not sufficient to prove a

17. Poole testified that the call could have been made any time between January 3 and January 5, 1982.

18. Even though the government relies exclusively on the *Pinkerton* concept of accomplice liability, the same result would also be required under an aiding and abetting theory. Judge Learned Hand explained that liability under an aiding and abetting theory demands that defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938); *see United States v. Varelli,* 407 F.2d at 749. There is no

evidence of any act by either Frederick or Murray that assisted the Covelli brothers in transporting the stolen jewelry from Illinois to Washington. If anything, the defendants were accessories after the fact and therefore could not be held liable as principals under 18 U.S.C. § 2. *Bollenbach v. United States,* 326 U.S. 607, 610–11, 66 S.Ct. 402, 404, 90 L.Ed. 350 (1946). Here, just as in *Varelli,* "defendants entered the scheme or plan too late to be considered aiders or abettors" in the transportation of the jewelry from Illinois to Washington. *United States v. Varelli,* 407 F.2d at 749; *see also United States v. Greer,* 467 F.2d at 1068–69.

defendant's guilt. However, while 'mere presence at the scene of the crime or mere association with conspirators will not themselves support a conspiracy conviction ... presence or a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy.'

(Citations omitted.)

We believe that the government presented sufficient circumstantial evidence to establish Murray's knowledge that the jewelry was stolen. First, Poole testified that Murray called and asked him if he knew anyone who would be interested in a collection of jewelry. Murray told Poole that the collection was worth approximately $300,000.00 but that they would be willing to take much less for it. Murray stated that the jewelry came from a distress sale in the East. Later, Murray introduced Frederick to Poole over the phone and Frederick gave Poole further details concerning the possible sale. Poole was told that the sale had to be quick, in cash, and all to one buyer. It is true that Poole was unsure of the dates of the calls and exactly which defendants made the various statements. However, it is axiomatic that credibility questions and the weight to be given evidence are matters for the jury. Poole's testimony adequately establishes that both before and after the flight from Pasco, Washington to Sacramento, California, Covelli, Frederick and Murray were taking affirmative steps in order to find a buyer for the jewelry. While Murray's mere association with the other conspirators is not sufficient in itself to establish his knowledge of the illegal purpose, the circumstances surrounding the defendants' actions support such an inference. "Presence has been sufficient evidence of knowing participation in a conspiracy when there were suspicious circumstances, and the existence of the conspiracy was already established." *United States v. Dalzotto*, 603 F.2d 642, 645 (7th Cir.), *cert. denied, Young v. United States*, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979). Here, the evidence shows that Murray knew that the other conspirators were desperate to make a quick cash sale.

Additional evidence of Murray's state of mind lies in the testimony of Mead Walker. After Poole failed to locate a buyer, in a further attempt to sell the jewelry the group immediately flew to Reno, Nevada where they were met by Walker. While at a motel cocktail lounge, Murray, Frederick and Walker were seated next to each other at a table and were watching a football game. Frederick asked Walker if he knew where they could sell some jewelry. Although Poole was told the jewelry came from a distress sale in the East, Walker was told that Covelli had collected it as brokerage fees. These inconsistent versions of the source of the goods are evidence that Murray was aware of the stolen nature of the merchandise. Although Murray contends that he was not a party to this conversation since he was occupied watching the football game, Walker testified that both Frederick and Murray were involved in the conversation, and the jury could have properly found as much.

Finally, Murray's post-arrest statement to Agent Shelton is most incriminating. Murray admitted to Shelton that he felt the jewelry "might be hot." Even though a mere suspicion of illegal activity does not conclusively establish guilty knowledge, it is at least evidence indicative of Murray's culpable state of mind. Moreover, Murray also admitted that he opened Covelli's briefcase at one point during the trip and saw the jewelry stuffed into socks. This is hardly a conventional manner of transporting a great deal of expensive jewelry. In contrast to his statements to Shelton, Murray stated before the grand jury that no attempt to sell any jewelry was made during the trip and that he never saw inside the briefcase.

In sum, we believe that a rational trier of fact could have found to the requisite degree of certainty that Murray was aware of the essential nature of the conspiracy. The circumstances of the proposed sale to Poole, the inconsistent stories about the

source of the goods, Murray's false statements to the grand jury and his statements to Agent Shelton establish a jury question as to the extent of Murray's knowledge. Although the jury was not required to find guilt beyond a reasonable doubt, the evidence, taken as a whole, leads us to conclude that a rational jury could properly reject and disbelieve Murray's claim of ignorance and find that he knew that the goods were stolen and knew the essential nature of the conspiracy.

 *Other issues.* Murray's final two contentions are less troublesome. He alleges that his conviction for making false statements before a grand jury must be reversed because the count in the indictment which charges this offense does not set forth the precise questions and answers given by Murray, but instead describes the false statements in substance. Murray filed neither a motion to dismiss for lack of specificity nor a motion for a bill of particulars in the district court and he did not allege this defect in any of his post-trial motions. A failure to challenge the specificity of an indictment in the trial court waives the objection on appeal. *United States v. Varkonyi,* 645 F.2d 453, 456 (5th Cir.1981); Fed.R.Crim.P. 12(b)(2), (f).[19] In any event, it is clear that there is no requirement that a perjury indictment set forth the exact words of the perjured testimony. *United States v. Ras,* 713 F.2d 311, 318 (7th Cir.1983). Murray's contention is thus without merit.

 Murray's last argument is that the district court erred in not granting a mistrial when the government allegedly violated the court's order excluding witnesses from the courtroom. Apparently, the government recalled Poole to the stand after informing him of evidence introduced in his absence which contradicted his earlier testimony in some respects. The government argues that the rule was not violated since Poole was not in the courtroom at any time except during his testimony.

However, informing a witness of the substance of testimony introduced in his absence certainly may violate the spirit, if not the letter, of a sequestration order. Nevertheless, the decision of whether or not to grant a mistrial for violation of a witness sequestration rule is a matter within the district court's discretion. *See, e.g., United States v. Womack,* 654 F.2d 1034, 1040 (5th Cir.1981), *cert. denied,* 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314 (1982). Murray has not demonstrated prejudice sufficient for us to conclude that the district court abused its discretion.

### III. CONCLUSION

 We reverse the convictions of Frederick and Murray under Count Three of the indictment. All the other convictions are affirmed. The government argues, and we agree, that when convictions on some of multiple counts are reversed and others are affirmed we may vacate all of the sentences and remand for appropriate resentencing without offending the Double Jeopardy Clause. *See United States v. DiFrancesco,* 449 U.S. 117, 133–39, 101 S.Ct. 426, 435–38, 66 L.Ed.2d 328 (1980); *United States v. Jefferson,* 714 F.2d 689, 707 (7th Cir.1983); *United States v. Raimondo,* 721 F.2d 476, 478 (4th Cir.1983). We therefore vacate the sentences of Frederick and Murray and remand to the district court for resentencing consistent with both this opinion and the trial judge's original intentions.

---

**19.** In contrast, an allegation that an indictment is so defective that it fails to state an offense is cognizable for the first time on appeal. *See*

*United States v. Meacham,* 626 F.2d 503, 509 (5th Cir.1980); Fed.R.Crim.P. 12(b)(2).