572 A.2d 746

**COMMONWEALTH of Pennsylvania**

**v.**

**Anna AKERS a/k/a Anna Wolfe, Appellant.**

Superior Court of Pennsylvania.

Argued Nov. 15, 1989.

Filed March 30, 1990.

174

H. David Rothman, Pittsburgh, for appellant.

Michael W. Streily, Asst. Dist. Atty., Pittsburgh, for Com., appellee.

Before ROWLEY, WIEAND and HOFFMAN, JJ.

WIEAND, Judge:

Anna Akers a/k/a Anna Wolfe [1] was charged with the shooting death of her husband, James Akers, in Hampton Township, Allegheny County, on June 29, 1972,[2] by criminal complaint filed September 9, 1985. On May 19, 1986, a jury found her guilty of first degree murder. After filing post-

1. Anna Akers married Gary Wolfe prior to the filing of the complaint.

2. Charges of murder, voluntary manslaughter and involuntary manslaughter were brought under and pursuant to the Penal Code of June 24, 1939, P.L. 872, §§ 701 and 703, 18 Pa.C.S.A. §§ 4701 and 4703.

trial motions on Mrs. Akers' behalf, trial counsel was permitted to withdraw from the case, and present counsel was retained. He filed several supplemental post-trial motions. These were the subject of subsequent evidentiary hearings. Thereafter, the trial court denied all post-trial relief and sentenced Mrs. Akers to prison for the term of her life. On direct appeal from the judgment of sentence, Mrs. Akers has submitted a brief which asserts numerous trial errors and more than thirty instances of alleged ineffective assistance by trial counsel. Finding no merit in any of appellant's contentions, we affirm the judgment of sentence.

The great number of issues raised by appellant causes us to be reminded of comments made by the Honorable Ruggero J. Aldisert of the United States Court of Appeals for the Third Circuit, who reflected:

'With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors. I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to any of them. I do not say that it is an irrebuttable presumption, but it is a presumption that reduces the effectiveness of appellate advocacy. Appellate advocacy is measured by effectiveness, not loquaciousness.'

*United States v. Hart,* 693 F.2d 286, 287 n. 1 (3d Cir.1982), quoting Aldisert, The Appellate Bar: Professional Competence and Professional Responsibility—A View From the Jaundiced Eye of One Appellate Judge, 11 Cap.U.L.Rev. 445, 458 (1982). See also: *Commonwealth v. Sirbaugh,* 347 Pa.Super. 154, 160–161, 500 A.2d 453, 456 (1985); *Commonwealth v. Klinger,* 323 Pa.Super. 181, 191, 470 A.2d 540, 545–546 (1983). Nevertheless, we have carefully examined the many arguments advanced by appellant which are assigned as a basis for granting appellate relief in this case.

At the time of the killing, appellant was accompanying her husband, a truck driver, who had travelled from Bur-

lington, Iowa, to Pittsburgh in order to make a delivery. After the delivery had been made, appellant and her husband spent the night in Room # 4, at Buskey's Motel on Route 8 in Hampton Township, Allegheny County. There it was that James Akers was fatally shot in the head at or about 3:00 a.m. on June 29, 1972. The specific facts adduced at trial which led to appellant's conviction were summarized in the trial court's opinion as follows:

Sometime following the shooting, the defendant sought help from the person staying in the next room (Room # 5), Ralph Sweet. She told Mr. Sweet that her husband had been shot by a masked intruder during a robbery—which account she repeated to various law enforcement authorities who questioned her; and which she also told to the jury at trial. Mr. Sweet, who had gone to bed at 1:00 a.m., had not heard any unusual noises (particularly, the gunshot from Room # 4), until the defendant had awakened him by pounding on his door.

When Hampton Township Police Officer Richard Montgomery arrived at the motel, Mr. Akers was lying on the bed. He had a bullet wound to his head but he was still alive. The Officer and the defendant assisted Mr. Akers to the bathroom where he wiped-off blood; and although he was unable to talk, he made no effort to indicate that his wife was responsible for this shooting, a fact which defense counsel emphasized on cross-examination.

Mr. Akers was taken to North Hills Passavant Hospital where he died as a result of this wound. According to Dr. Earl Davis, a forensic pathologist with the Allegheny County Coroner's Office, death was caused by a cerebral hemorrhage, due to the gunshot wound to his head. The bullet—which had been fired at close range—had entered Mr. Akers head by his left ear and it was recovered in the lower front lobe of the brain. Dr. Davis thought it highly unlikely that Mr. Akers would have been capable of walking to the bathroom or any other voluntary movement as a result of his injury.

While still at the motel, the defendant discussed this shooting with Officer Montgomery in greater detail than she had with Mr. Sweet. According to her account, she had gone into the bathroom and left her husband lying in bed. When she returned, she said that a masked intruder with a gun was standing beside her husband, demanding money. (She said that she or her husband had apparently left the door to the room unlocked.) When she turned her back to reach for her husband's wallet, she heard him call the intruder a "filthy hippie" and then she heard a shot. She begged the intruder not to shoot him again. The intruder went into the bathroom "for several minutes", came back out and told her to stay in the room for 15 minutes. She gave Officer Montgomery a general description of this man. A .22 caliber pistol was found inside the Akers' luggage but it was determined *not* to be the gun used in the shooting.

Between 7:00 and 9:00 a.m. that morning (6/29/72), the defendant was taken downtown and questioned by Detective Richard Byers, a homicide investigator for the Allegheny County Police. His typed notes—containing the same information that she had told Officer Montgomery—were read to the jury. Mrs. Akers was given a neutron activation test (to check for gun powder residue on her hands) but the results were negative.

In August, 1972, the police had a suspect in custody and Detective Byers called the defendant in Iowa to ask some additional questions (particularly, regarding her description) and to make arrangements for her to come to Pittsburgh to view a line-up. The Detective read his notes of this phone interview to the jury. Because the defendant was unable to make an identification, the suspect was released and the case remained unsolved.

In the summer of 1976, about 4 years after the homicide, during some renovation work in the bathroom of Room # 4, a pistol wrapped in what appeared to be blood-stained toilet tissue and containing 5 live rounds and 1 spent round was found hidden underneath the

bottom drawer of the bathroom vanity. It was turned over to Lt. Itri of the Hampton Township Police Department who took it to the Allegheny County Crime Lab for testing. Dr. Robert Levine, a Criminalist with the Crime Lab, made a comparison between the bullet slug recovered from Mr. Akers skull and one he test fired from this pistol and he concluded that this was the gun used to kill Mr. Akers.

Dr. Levine further testified that it was not unusual for the results of a neutron activation test to be negative, since gun powder residue easily brushes off (for example, by washing hands or putting them in pockets); and that it is difficult to find fingerprints on a pistol, this being the exception rather tha[n] the rule. The gun was examined for fingerprints but none were found. The test results, if any, [from the] blood-stained toilet paper which had been signed out to another section of the Crime Lab were not presented to the jury.

The discovery of this gun did not come to Detective Byers' attention until August, 1984 at which time the case was reopened for additional investigation. One year later, the defendant was arrested and charged with this crime. This additional investigation resulted in the following evidence.

Carrie Giza (th[e]n 19 years old) and her future husband, Robert, had stayed in a room on the front right side of Buskey's Motel "sometime during the summer of 1972". According to Ms. Giza, they arrived when it was dark and stayed until the early morning hours. They had heard an argument between a man and a woman in the next room, the man saying "whore and bitch" and the woman saying "mother fucker" which argument had lasted on and off for a couple of minutes. Ms. Giza and Robert had laughed about this argument and it did not alarm them. Following the argument, they heard a bang which Ms. Giza said sounded like a truck backfiring.

The next day, Ms. Giza heard about a shooting at Buskey's Motel but she did not call the police. She did

not want to become involved since she was embarrassed about staying at the motel with Robert. Lt. Itri of the Hampton Township Police Department testified that from 1972 until the time of trial, this was the only shooting which had been reported at Buskey's Motel. From this circumstan[t]ial evidence, the jury was entitled to conclude that in fact Carrie Giza had been at Buskey's Motel the night of this shooting.

Mrs. Giza's estranged husband, Robert Giza, testified as a defense witness that although he had stayed at Busk[e]y's Motel with Carrie, he did not recall hearing an argument and a bang.

In addition, Detectives questioned two people who knew the defendant in 19[7]2, both of whom testified at trial. For several months prior to the shooting, Vester Shaw had "dated" the defendant roughly once a week. According to his testimony, she had complained to him that her husband had a bad temper and that he had once threatened her with a gun. One month before her husband's death, the defendant had considered the possibility of a plan to eliminate her husband. When she returned to Iowa after the shooting, she denied having anything to do with her husband's death but told Mr. Shaw he had been shot by a masked intruder. Soon thereafter, the defendant broke off her relationship with Shaw despite his various efforts to reconcile.

Maxine Cornick and her husband had been friends with Mr. and Mrs. Akers for several years before the shooting. Five months before Mr. Akers death, the defendant had shown Mrs. Cornick a dark blue handgun and said that her husband had given it to her for protection. Mrs. Cornick was unable to identify Commonwealth's Exhibit # 4 (the gun) as the *same* gun although she testified that it looked the same. The defendant had also taken Mrs. Cornick to her basement where she had shown the witness a heavy sleeping bag which she said she used for target practice. In addition, the defendant once took Mrs. Cornick to Vester Shaw's apartment—using her own

key to get inside—and showed her the bedroom where she said they had "spent time together". Mrs. Cornick said that she knew Mr. Akers had been jealous; and the defendant told her that he had once threatened her and the next day sent roses and apologized.

The defendant testified on her own behalf. She told the jury that a masked intruder had shot her husband as she had stated to the police. In addition, she denied having any relationship with Vester Shaw—that she never dated him or slept with him; and she denied telling Mrs. Cornick that she had done so. She also denied taking Mrs. Cornick to Mr. Shaw's apartment contending that she had only been there once before for the purpose of dropping-off Mr. Shaw's girlfriend at a party. Both sides presented rebuttal and surrebuttal evidence dealing with the existence or non-existence of a relationship between Shaw and the defendant.

Appellant advances a multi-faceted argument which is difficult to follow but which, in essence, challenges the sufficiency and weight of the evidence. She argues that because Carrie Giza, Vester Shaw and Maxine Cornick, witnesses appearing on behalf of the Commonwealth, had not come forward at the time of the shooting in 1972, but had waited more than twelve years to disclose relevant information to the police, their testimony was rendered inherently improbable, incredible and unreliable, and, as such, was inadmissible. Because of the incredible nature of the Commonwealth's evidence when contrasted with appellant's own spontaneously rendered and credible version, it is asserted that "the evidence was insufficient to establish that the offense did not occur in the manner described by appellant." Similarly, appellant argues that because the Commonwealth's evidence was incredible, it resulted in a verdict which was contrary to the weight of the evidence. Finally, appellant contends that a conviction based on such unreliable evidence deprived her of a fair trial and violated her rights to due process and equal protection of the law.

"In reviewing appellant's challenge to the sufficiency of the evidence we must determine 'whether, viewing all the evidence admitted at trial, together with all reasonable inferences therefrom, in the light most favorable to the Commonwealth, the trier of fact could have found that each element of the offense[ ] charged was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt.' " *Commonwealth v. Sabharwal,* 373 Pa.Super. 241, 243, 540 A.2d 957, 958 (1988), quoting *Commonwealth v. Jackson,* 506 Pa. 469, 472–473, 485 A.2d 1102, 1103 (1984). "When conflicts and discrepancies arise, it is within the province of the jury to determine the weight to be given to each [witness's] testimony and to believe all, part, or none of the evidence as they deem appropriate." *Commonwealth v. Verdekal,* 351 Pa.Super. 412, 419–420, 506 A.2d 415, 419 (1986). See also: *Commonwealth v. Rose,* 463 Pa. 264, 268, 344 A.2d 824, 826 (1975). The same standard is applicable in cases, such as the instant case, where the evidence supporting a conviction "is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Hardcastle,* 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988). See also: *Commonwealth v. Sullivan,* 472 Pa. 129, 150, 371 A.2d 468, 478 (1977); *Commonwealth v. Petrisko,* 442 Pa. 575, 579–580, 275 A.2d 46, 49 (1971). There is no requirement that the Commonwealth exclude all possibility that a third party may have committed the crime. See: *Commonwealth v. Sullivan, supra* at 152–153, 371 A.2d at 479; *Commonwealth v. Kravitz,* 400 Pa. 198, 212–213, 161 A.2d 861, 868 (1960), *cert. denied,* 365 U.S. 846, 81 S.Ct. 807, 5 L.Ed.2d 811 (1961).

When viewed in this light, it is evident that the Commonwealth's evidence was legally sufficient to support appellant's conviction for first degree murder. The evidence at trial established that a month prior to the shooting appellant had expressed a desire to have her husband killed. The evidence also established a motive for the killing. There was also testimony that appellant possessed a gun

similar to the murder weapon, so that a jury could find that she had the means with which to commit the crime. Finally, appellant was present in the motel room when her husband was shot, thus giving her an opportunity to commit the crime which she said she had wanted to commit. From the testimony of Carrie Giza, the jury also could have found that the fatal shot was fired following a heated argument between appellant and her husband. Although appellant claimed that an unknown robber had entered the room and killed her husband, the credibility of such testimony was for the jury to determine. The jury could, as it did, reject appellant's version of events and accept as true the evidence presented by the Commonwealth. Appellant's suggestion on appeal that her testimony was credible, while that of the Commonwealth's witnesses was incredible, provides no basis for relief. Credibility issues were for the jury.

Appellant's challenge to the weight of the evidence must also fail. "The determination whether to grant a new trial on the ground that the verdict is against the weight of the evidence rests within the discretion of the trial court, and we will not disturb that decision absent an abuse of discretion." *Commonwealth v. Hunter*, 381 Pa.Super. 606, 617, 554 A.2d 550, 555 (1989). "A trial court should award a new trial on the ground that the verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Commonwealth v. Whitney*, 511 Pa. 232, 239, 512 A.2d 1152, 1155–1156 (1986). "Where the evidence is conflicting, the credibility of the witnesses is solely for the jury, and if its finding is supported by the record, the trial court's denial of a motion for a new trial will not be disturbed." *Commonwealth v. Larew*, 289 Pa.Super. 34, 37, 432 A.2d 1037, 1038 (1981). Instantly, appellant's assault on the jury's credibility determinations is not persuasive that there was an abuse of discretion by the trial court when it refused to award a new

trial on the ground that the verdict was contrary to the weight of the evidence.

■ Appellant has cited no authority [3] and our research has disclosed none which supports her contention that the passage of time renders a witness's testimony inadmissible as a matter of law. In *Commonwealth v. Lane,* 521 Pa. 390, 555 A.2d 1246 (1989), the Supreme Court reiterated that, in cases involving sexual offenses, the failure of a victim to make a prompt complaint is a matter bearing upon the credibility of the witness and is for the jury to consider, but it does not render the victim's testimony inadmissible.

It is hornbook evidentiary law that a witness may be impeached by showing that, on a prior occasion, he or she engaged in conduct inconsistent with testimony given at trial. *See* 3A Wigmore, Evidence § 1042 (Chadbourne rev. 1970).

*See also Commonwealth v. Turner,* 499 Pa. 579, 583, 454 A.2d 537 (1982). A corollary to this rule is that

[i]f a witness had been under a duty to speak on a prior occasion, or if it would have been natural for the witness to have spoken on such an occasion, but the witness remained silent, the witness may be impeached by showing that the present testimony included a fact as to which he had been silent on a prior occasion. Torcia, Wharton's Criminal Evidence § 436 (14th ed. 1986) (emphasis added).

*Commonwealth v. Lane, supra,* 521 Pa. at 397, 555 A.2d at 1250. This we deem a correct statement of the law. The failure of Commonwealth witnesses to come forward in 1972 was a matter affecting the weight and credibility of their testimony, but it did not render their testimony incompetent and inadmissible. Cf. *Commonwealth v. Rodgers,* 472 Pa. 435, 458–459, 372 A.2d 771, 782 (1977) (plurality opinion) (although defendant's alibi witnesses had no legal

3. A 1938 divorce case decided by the Maryland Court of Appeals and relied upon by appellant is inapposite and provides no support for appellant's contention that a witness's failure to disclose evidence promptly renders his or her testimony inadmissible as a matter of law. See: *Jones v. Jones,* 174 Md. 522, 199 A. 513 (1938).

duty to inform police immediately of defendant's whereabouts at time crime was committed, Commonwealth could properly cross-examine witnesses as to failure to come forward, for this went to the witnesses' credibility and was, therefore, a proper area of cross-examination).

While there is no statute of limitations in homicide cases, the due process clause of the Fourteenth Amendment of the United States Constitution requires dismissal of criminal charges if pre-indictment delay causes substantial prejudice to the defendant's right to a fair trial and such delay has been employed by police as an intentional device to gain a tactical advantage over an accused. *Commonwealth v. Arnold,* 331 Pa.Super. 345, 360, 480 A.2d 1066, 1074 (1984), quoting *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468, 480–481 (1971). See also: *Commonwealth v. Berry,* 355 Pa.Super. 243, 251, 513 A.2d 410, 414 (1986); *Commonwealth v. Murphy,* 305 Pa. Super. 246, 252, 451 A.2d 514, 517 (1982). The Commonwealth is not required by the Constitution to file charges as soon as it obtains evidence of a defendant's guilt. Rather, it may delay the filing of charges in order to conduct further investigation. "A delay for a reasonable investigation does not violate due process even if it adversely affects the defendant's case." *Commonwealth v. Colson,* 507 Pa. 440, 452, 490 A.2d 811, 817 (1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986). See also: *United States v. Lovasco,* 431 U.S. 783, 795–796, 97 S.Ct. 2044, 2051–2052, 52 L.Ed.2d 752, 762–763 (1977); *Commonwealth v. Sneed,* 514 Pa. 597, 604, 526 A.2d 749, 752–753 (1987).

Instantly, appellant does not argue that the Commonwealth intentionally delayed the filing of charges against her. Rather, she contends that due process and equal protection of the law required the witnesses against her to come forward in 1972 or shortly thereafter to provide the evidence which was subsequently relied upon by the Commonwealth. In so doing, she concedes that "there is no evidence that the Commonwealth prevented or discouraged

the witnesses from coming forward." Our review of the evidence confirms that the Commonwealth took no intentional action to delay the filing of charges in the instant case. Until the Commonwealth uncovered information possessed by Giza, Shaw and Cornick, it lacked adequate cause for bringing a criminal charge against appellant. Under these circumstances there was not a showing that the Commonwealth's action in causing or allowing the delay was "fundamentally unfair." Therefore, there was not a due process violation. *United States v. Lovasco, supra.* Cf. *Commonwealth v. Berry, supra* (no due process violation where pre-indictment delay was solely attributable to victim's reluctance to report the crimes). Moreover, appellant has failed to allege specifically in what manner the delay prevented her from receiving a fair trial. Instead, she relies solely upon the erroneous belief that the Commonwealth witnesses were under a legal duty to come forward. As we have already observed, no such duty existed.

■ Appellant next argues that the trial court should have stricken the testimony of Carrie Giza because it lacked specificity. Appellant argues that because Giza did not know the exact date on which she had stayed at Buskey's Motel and was unable to state positively that the bang which she had heard was a gunshot, the witness should not have been allowed to testify. A similar argument was rejected by the Superior Court in *Commonwealth v. Palmer,* 273 Pa.Super. 184, 417 A.2d 229 (1979). There, a witness testified that she had heard sobbing, then a cry and a bang. The witness described the sobbing and cry as sounding like a female voice and the bang as sounding like a firecracker. On cross-examination, however, the witness admitted that she was not certain what the sounds were. The defendant argued that the witness's testimony was too uncertain to be admitted at trial, but the Superior Court held that the uncertainties of the witness had been subjected to cross-examination and "bore on the weight to be accorded [the witness's] testimony, not its admissibility."

*Commonwealth v. Palmer, supra,* 273 Pa.Superior Ct. at 191, 417 A.2d at 232. Similarly in the instant case, although Giza was not certain of the date on which she had stayed at the motel, she said she had learned the next morning that a shooting had occurred. The Commonwealth produced evidence that no other shootings had occurred at the motel. Thus, it was possible for the jury to find that Giza had been at the motel on the night on which Akers had been shot. Whether the bang which Giza had heard was, in fact, a gunshot was for the jury to determine. The uncertainties in Giza's testimony went to its weight, not the admissibility thereof. Similarly, the fact that Giza's testimony was contradicted by that of her husband did not render her testimony inadmissible. The conflict in the testimony of husband and wife witnesses was for the jury to resolve.

■ Appellant argues that Maxine Cornick's testimony that appellant had shown her a gun similar to the murder weapon five months prior to the crime should also have been excluded. Appellant's possession of the gun was too remote in time, it is argued, to have been relevant. Appellant also asserts that Cornick's inability to identify specifically that the gun possessed by appellant was the murder weapon rendered Cornick's testimony inadmissible.

" 'The question of remoteness, which is basically one of relevance, is properly vested in the discretion of the trial court, and its decision thereon will not be reversed unless a clear abuse of discretion is shown.' " *Commonwealth v. Sullivan,* 372 Pa.Super. 88, 91, 538 A.2d 1363, 1365 (1988), quoting *Tolentino v. Bailey,* 230 Pa.Super. 8, 13, 326 A.2d 920, 922 (1974). In *Commonwealth v. Yount,* 455 Pa. 303, 314 A.2d 242 (1974), the Supreme Court observed that a defendant's possession of a weapon that could have been used to commit the crime is relevant. The Court explained that such evidence:

> is relevant to show that the defendant owned or had access to an implement with which the crime could have been committed.

The possession by the defendant of a weapon or implement of crime is relevant even though there is no evidence that it was used in the commission of any particular crime, but there must be evidence that some crime was committed.

The possession or ownership of the weapon or implement of crime must be reasonably proximate to the commission of the crime. If too great a period has elapsed between the commission of the crime and the period of possession or ownership, the evidence would be too remote and hence inadmissible.

*Id.*, 455 Pa. at 316 n. 8, 314 A.2d at 249 n. 8, quoting 1 Wharton's Criminal Evidence § 211 at 441–442 (13th ed. C. Torcia 1972). In *Commonwealth v. Shoatz*, 469 Pa. 545, 366 A.2d 1216 (1976), the Supreme Court concluded that the defendant's possession of automatic rifles at the time of his arrest, eighteen months after the shooting of two police officers, was admissible on the ground that the jury could reasonably infer therefrom that the defendant had participated in the shooting. In rejecting the defendant's argument that his possession of the weapons was too remote in time, the *Shoatz* Court said:

With regard to the argument of the interval of time that dissipated any relationship that may have normally flowed from the possession and the connection with the event, it must be remembered that such a consideration is one for a jury to resolve in evaluating the weight of the probative value of the offered evidence and not its competency.

*Id.* at 565, 366 A.2d at 1226. See: *United States v. Covelli*, 738 F.2d 847, 855–856 & n. 14 (7th Cir.1984), *cert. denied*, 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984) (testimony concerning defendant's possession of handgun on two occasions, once three years prior to and once seven months prior to shooting, was admissible); *United States v. Zappola*, 677 F.2d 264, 270 (2d Cir.1982), *cert. denied*, 459 U.S. 866, 103 S.Ct. 145, 74 L.Ed.2d 122 (1982) (testimony that defendant possessed handgun six months prior to crime was properly

admitted as evidence of access to weapon); *Commonwealth v. Clark,* 280 Pa.Super. 1, 5–7, 421 A.2d 374, 376–377 (1980), *aff'd,* 501 Pa. 393, 461 A.2d 794 (1983) (testimony regarding defendant's possession of knife five weeks after commission of crime admissible even though victim was unable to identify knife). See also: *Commonwealth v. Coccioletti,* 493 Pa. 103, 110, 425 A.2d 387, 390 (1981); *Commonwealth v. Lark,* 316 Pa.Super. 240, 254, 462 A.2d 1329, 1336 (1983), *aff'd,* 505 Pa. 126, 477 A.2d 857 (1984).

When the principles of law in these cases are applied to the instant case it is readily apparent that the trial court did not abuse its discretion by allowing Maxine Cornick to testify regarding appellant's possession of a handgun five months before the shooting.

■ After the jury had been instructed upon the applicable law and had retired to deliberate, it requested the trial court to repeat the law pertaining to first and second degree murder. Defense counsel thereupon asked the court to recharge the jury on all degrees of homicide. The trial court declined this request and addressed only the jury's specific request. This is now asserted as error. "The scope of supplemental instructions given in response to a jury's request rests within the sound discretion of the trial judge. He may properly confine supplemental instructions to the particular question asked by the jury despite a defendant's request for additional instructions." *Commonwealth v. Haddle,* 271 Pa.Super. 418, 422, 413 A.2d 735, 738 (1979). See also: *Commonwealth v. Perkins,* 473 Pa. 116, 131–132, 373 A.2d 1076, 1083–1084 (1977); *Commonwealth v. Boone,* 467 Pa. 168, 180–181, 354 A.2d 898, 904 (1975). Instantly, we perceive no abuse of discretion in the trial court's confining its supplemental instructions to the specific areas of the jury's inquiry.

■ Also asserted by appellant as error is the trial court's allowing the jury to take the murder weapon out with it during its deliberations. The law applicable to this is as follows:

'Decisions as to what exhibits may be taken out[ ] by the jury are within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Commonwealth v. Sparks*, 351 Pa.Super. 320, 327–328, 505 A.2d 1002, 1006 (1986); *Commonwealth v. Lybrand*, 272 Pa.Super. 475, 484, 416 A.2d 555, 560 (1979); *Commonwealth v. Merbah*, 270 Pa.Super. 190, 196, 411 A.2d 244, 247 (1979). See also: Pa.R.Crim.P. 1114. To establish an abuse of discretion, appellant must show that the trial court disregarded or misapplied the law or that " 'the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record....' " *Commonwealth v. Jackson*, 336 Pa.Super. 609, 627, 486 A.2d 431, 441 (1984).'

*Commonwealth v. Riffert*, 379 Pa.Super. 1, 22, 549 A.2d 566, 577 (1988), quoting *Commonwealth v. Thomas*, 372 Pa.Super. 349, 363, 539 A.2d 829, 836–837 (1988). Other appellate decisions have consistently refused to find an abuse of discretion where the murder weapon was allowed to be taken out with the jury. See: *Commonwealth v. Hobson*, 484 Pa. 250, 254–256, 398 A.2d 1364, 1366–1367 (1979) (revolver); *Commonwealth v. Datesman*, 343 Pa.Super. 176, 188, 494 A.2d 413, 419 (1985) (shotgun). Similarly, we find no abuse of discretion here.

We turn now to appellant's many assertions that counsel rendered ineffective assistance. In evaluating claims of ineffective assistance of counsel we utilize the following approach:

Because the law presumes that counsel is effective, the burden of establishing ineffectiveness rests with appellant. *Commonwealth v. Floyd*, 506 Pa. 85, 90, 484 A.2d 365, 367 (1984); *Commonwealth v. McKendrick*, 356 Pa.Super. 64, 71, 514 A.2d 144, 148 (1986), *allo. denied*, 514 Pa. 629, 522 A.2d 558 (1987). To meet that burden, appellant must demonstrate that 1) the issue underlying his claim of ineffectiveness is of arguable merit; 2) the course chosen by counsel had no reasonable basis de-

signed to serve his interests; and 3) he suffered prejudice as a result of counsel's ineffectiveness. *Commonwealth v. Pierce*, 515 Pa. 153, 158–160, 527 A.2d 973, 975–76 (1987); *Commonwealth v. Buehl*, 510 Pa. 363, 378–79, 508 A.2d 1167, 1174–75 (1986); *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 604–5 & n. 8, 235 A.2d 349, 352–53 & n. 8 (1967).

*Commonwealth v. House*, 371 Pa.Super. 23, 28, 537 A.2d 361, 363 (1988). Moreover,

"[b]efore a claim of ineffectiveness can be sustained, it must be determined that, in light of all the alternatives available to counsel, the strategy actually employed was so unreasonable that no competent lawyer would have chosen it." *Commonwealth v. Miller*, 494 Pa. 229, 431 A.2d 233 (1981). We inquire whether counsel made an informed choice, which at the time the decision was made reasonably could have been considered to advance and protect defendant's interests. See *Commonwealth v. Hill*, 450 Pa. 477, 301 A.2d 587 (1973). Thus, counsel's assistance is deemed constitutionally effective once we are able to conclude the particular course chosen by counsel had some reasonable basis designated to effectuate his client's interests. The test is not whether other alternatives were more reasonable, employing a hindsight evaluation of the record. *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 604, 235 A.2d 349 (1967).

*Commonwealth v. Dunbar*, 503 Pa. 590, 596, 470 A.2d 74, 77 (1983). Having evaluated appellant's many claims of ineffectiveness of trial counsel in light of the foregoing principles, we conclude that appellant has not met her burden of proving that trial counsel was constitutionally ineffective. Our discussion of each of these many contentions, therefore, will be brief.

Appellant contends that trial counsel was ineffective because he refrained from calling character witnesses in the mistaken belief that they would be subject to cross-examination regarding her arrest in Iowa on a charge of

arson.[4] That such cross-examination would not have been permitted is clear. See: *Commonwealth v. Scott,* 496 Pa. 188, 436 A.2d 607 (1981). However, counsel assured the post-verdict court that he had been aware that the Commonwealth would not have been permitted to so cross-examine defense character witnesses and testified that his concern was with the fact that appellant did not enjoy a good reputation in the community in which she lived. Because of this he was fearful that the Commonwealth would also be able to call character witnesses who would rebut any testimony by defense witnesses that appellant enjoyed a good reputation. This matter was discussed by trial counsel and his client and it was agreed mutually that character witnesses would not be called. This was a reasonable decision intended to serve appellant's interest. The trial court did not err in denying relief on this ground. Cf. *Commonwealth v. Peterkin,* 511 Pa. 299, 319, 513 A.2d 373, 383 (1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987) ("[C]ounsel's concern, that the potential harm from cross-examination of character witnesses outweighed the doubtful value of their testimony, was a reasonable basis for not pursuing potential character witnesses or presenting character evidence.").

▆▆▆ Appellant's contention that counsel ineffectively conducted voir dire examination of prospective jurors is also lacking in merit.

The single goal in permitting questioning of prospective jurors is to provide the accused with a competent, fair, impartial and unprejudiced jury. *Commonwealth v. England,* 474 Pa. 1, 375 A.2d 1292 (1977). However, it is not intended to provide appellant with a better basis upon which to utilize his peremptory challenges. The inquiry should be strictly confined to disclosing qualifications or lack of qualifications and should focus on whether a juror has formed a fixed opinion as to an accused's guilt or innocence. *Id.*

4. Appellant was subsequently acquitted of this charge.

*Commonwealth v. Hathaway,* 347 Pa.Super. 134, 142–143, 500 A.2d 443, 447 (1985). See also: *Commonwealth v. Drew,* 500 Pa. 585, 459 A.2d 318 (1983); *Commonwealth v. Myers,* 376 Pa.Super. 41, 545 A.2d 309 (1988). Moreover, questions which are "designed to disclose what a juror's present impression or opinion may be or what his attitude or decision will likely be under certain facts which may be developed in the trial of the case" should not be permitted. *Commonwealth v. Werts, supra,* 483 Pa. [222] at 224, 395 A.2d [1316] at 1317 [ (1978) ], quoting *Commonwealth v. Johnson,* 452 Pa. 130, 134, 305 A.2d 5, 7 (1973). *Commonwealth v. Merrick,* 338 Pa.Super. 495, 500–501, 488 A.2d 1, 3 (1985). For this reason, it has been held improper to ask a juror about his or her attitude regarding the insanity defense, *Commonwealth v. Merrick, supra,* or about gang related incidents. *Commonwealth v. Wilson,* 482 Pa. 350, 354–355, 393 A.2d 1141, 1144 (1978). Similarly, it would have been improper in the instant case to interrogate prospective jurors regarding their attitudes on appellant's adultery. Because there is no substantive merit in appellant's underlying argument, her trial counsel will not be deemed ineffective for failing to examine prospective jurors on such a matter.

 There also is no merit in appellant's suggestion that counsel was ineffective for accepting a juror whom he had previously challenged for cause. Although this prospective juror initially had answered that she would be more likely to believe a policeman's testimony, subsequent questioning established that she would be able to apply the court's instructions regarding witness credibility equally to police and lay witnesses alike. It was for this reason, that the trial court had refused a challenge for cause.

The test for determining whether a prospective juror should be disqualified is whether he or she is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor, *Commonwealth v. Bighum,* 452 Pa. 554, 307

A.2d 255 (1973). It must be determined whether any biases or prejudices can be put aside on proper instruction of the court, *Commonwealth v. Drew*, 500 Pa. 585, 459 A.2d 318 (1983). A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct and answers to questions, *Commonwealth v. Colon*, 223 Pa.Super. 202, 299 A.2d 326 (1972). The decision on whether to disqualify is within the sound discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion, *Commonwealth v. Black*, 474 Pa. 47, 376 A.2d 627 (1977).

*Commonwealth v. Colson, supra* at 454, 490 A.2d at 818. See also: *Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656 (1986), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987); *Commonwealth v. Hashem*, 363 Pa.Super. 111, 525 A.2d 744 (1987). Inasmuch as the trial court had found that the witness was able and willing to follow the court's instructions regarding the credibility of witnesses, trial counsel will not be deemed ineffective for failing to use a peremptory challenge to exclude the same juror. See: *Commonwealth v. Copeland*, 381 Pa.Super. 382, 392–394, 554 A.2d 54, 59 (1988).

▮▮▮ Appellant argues also that trial counsel was ineffective for failing to request the trial court to instruct the jury that: (1) the credibility of Commonwealth witnesses Shaw, Giza and Cornick should be subjected to more careful scrutiny because of their delay in coming forward; and (2) appellant's testimony about the intruder shooting her husband was entitled to be favorably viewed because it was a spontaneous utterance. These assertions, however, are unsupported by established evidentiary principles; and counsel will not be deemed ineffective for failing to make such requests. Moreover, the trial court fully and adequately instructed the jury on the issue of the credibility of

witnesses. "Where the substance of the requested charge is adequately and clearly conveyed, the court's failure to give the verbatim instruction [suggested] by appellant is not error." *Commonwealth v. Freeman*, 295 Pa.Super. 467, 479, 441 A.2d 1327, 1333 (1982). See also: *Commonwealth v. LaMassa*, 367 Pa.Super. 54, 58, 532 A.2d 450, 452 (1987); *Commonwealth v. Rhem*, 283 Pa.Super. 565, 576, 424 A.2d 1345, 1351 (1980). There is no substantive merit in appellant's contention.

 The claim that trial counsel was ineffective for failing to raise as an issue that appellant's right to a speedy trial was violated because of the delay between 1972 and the filing of the complaint in 1985 is lacking in merit. "Passage of time between crime and arrest is not a matter within the context of Sixth Amendment speedy trial rights. Only a formal indictment, information or arrest, any of which binds an accused to respond to a criminal charge, invokes Sixth Amendment privileges. Once a citizen's liberty is restrained, [her] speedy trial rights are activated." *Commonwealth v. Arnold, supra* at 360, 480 A.2d at 1074. Equally lacking in merit is appellant's contention that counsel was ineffective for not asserting constitutional violations of due process and equal protection because of the failure of the Commonwealth witnesses to come forward promptly. We have already discussed these contentions at length, and have found the underlying issues to be devoid of merit.

The remaining contentions of ineffectiveness discussed in appellant's brief are nothing more than a hindsight analysis of strategic decisions made and trial tactics adopted by trial counsel. In essence, appellant takes issue with trial counsel's investigation and evaluation of the case, his examination and cross-examination of witnesses at trial, his arguments to the jury and his failure to object to arguments advanced by the Commonwealth, as well as numerous other decisions made by counsel. We have examined these contentions and have reviewed the trial transcript and the testimony provided at the several post-trial evidentiary

hearings. Our review has disclosed no basis for finding trial counsel constitutionally ineffective.

■ The final argument made by appellant is a blanket assertion that the trial court failed to provide an in depth review of issues in its post-trial opinion. We find this argument patently unfounded. The record discloses that the trial court allowed appellant to file several supplemental post-trial motions and heard testimony thereon. The court thereafter prepared a twenty page opinion in which most, if not all, of appellant's many contentions were specifically addressed. On appeal, we have determined that appellant's numerous arguments were lacking in merit. Some of those arguments misperceived established principles of law, and others were made without citation to authority. That the trial court's discussion of such arguments was brief did not imply a lack of diligence by the court but only a lack of merit in appellant's contentions. We have reviewed appellant's contentions and have found no basis for disturbing the jury's verdict.

The judgment of sentence is affirmed.