J-A17016-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ERNEST WILLIAMS | : | |
| | : | |
| Appellant | : | No. 1569 WDA 2016 |

Appeal from the Judgment of Sentence July 5, 2016
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0016085-2013

BEFORE: OTT, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.: **FILED JANUARY 31, 2019**

Ernest Williams appeals from the judgment of sentence imposed on July 5, 2016, in the Court of Common Pleas of Allegheny County, following his conviction of first-degree murder and carrying a firearm without a license. Williams received the mandatory term of life imprisonment. In this timely appeal, Williams claims the suppression court erred in failing to suppress all evidence obtained against him resulting from his warrantless arrest. As a part of this claim, Williams also argues the suppression court erred in failing to view a surveillance video of the crime to determine the reliability of a police officer's identification of the car therein as his automobile. Finally, Williams claims the trial court erred in failing to dismiss a juror who saw Williams walking down a courthouse hallway accompanied by a uniformed officer. After a thorough review of the submissions by the parties, relevant law, and the certified record, we affirm.

The facts underlying this matter are related from the August 9, 2017, joint trial court opinion of Judges Randall B. Todd and Philip A. Ignelzi.

On May 19, 2014, the Suppression Court heard testimony from Commonwealth witnesses regarding [Williams'] Omnibus Pretrial Motions, specifically, the Motion to Suppress Physical Evidence and Statements. The Suppression Hearing was continued on July 9, 2014.

At the May 19, 2014 hearing, Officer James Caterino testified he was working as a patrolman for West Homestead on November 4, 2013. He has been employed as a detective for the Borough of Munhall for eight years and a patrolman for the Borough of West Homestead for two and a half years. On November 4, 2013, at approximately 3:30 a.m., Homestead dispatch put out a call for shots fired in the area of 19th and McClure Street, which Officer Caterino categorized as a high crime area.

Officer Caterino and Lt. Steele responded to the area and, as they were proceeding southbound on McClure coming off the 11th Avenue extension, they encountered a dark colored vehicle driving westbound on 11th Avenue. Since it was obvious to Officer Caterino that this vehicle was travelling at a high rate of speed, he performed a U-turn at the intersection of McClure and 12th to get behind the vehicle. The vehicle further failed to stop at a stop sign at McClure and 11th Avenue. Officer Caterino initiated a traffic stop, the vehicle continued to make a right turn onto Ann Street, where it was ultimately stopped. The vehicle was a black Ford Five Hundred and [Williams] was the sole occupant. When Officer Caterino approached [Williams], he [Williams] was sweating profusely, fidgeting in his seat and wearing a red sweatshirt and gray pants.

[Williams] was asked to step out of the vehicle, he gave consent to search his person and vehicle, and no evidence was recovered. He was not in custody at this time and freely answered any questions posed to him. Lt. Steele asked [Williams] where he was coming from and he indicated the Trapper's Club in Homewood. Officer Caterino became suspicious when he heard [Williams] tell Lt. Steele he was coming home from the Trapper's Club to his place on 13th Street. According to Officer Caterino, the East 11th

Avenue Extension is not accessible if [Williams] was traveling across the Rankin Bridge to his home on 13th Street.

Officer Caterino is familiar with the East 11th Avenue Extension, noted that the area [Williams] had just passed was known as Cow's Hill, and, based on his experience as a police officer, Cow's Hill is an area known for discarding guns. [Williams] was released and the officers proceeded to 19th and McClure Street, where the call said shots were fired. Upon arriving, Officer Caterino observed that there were video cameras at the business of Hruska's Plumbing, located at the very intersection of the shooting. Officer Caterino and County Detectives viewed the surveillance video at Hruska Plumbing and, Officer Caterino indicated to county detectives that he and Lt. Steele had just stopped [Williams] in a vehicle that looked exactly like the vehicle in the video. Officer Caterino recalled the vehicle had a grayish stripe or molding going across horizontally and a ragtop roof.

Further, the video depicted the actual shooting and showed the passenger (victim) get out and proceed to the rear of the car, then stop and go back to the passenger side, opening the door as if looking for something on the side of the seat, then get out again. The victim again walks to the rear of the vehicle, at which time the driver got out of the car and fires multiple shots at him. When the victim attempts to run, the driver fires more shots at the victim.

The second angle of the video was a side view of the business and showed the vehicle making a right hand turn and heading in the direction of the 11th Avenue Extension and Cow's Hill.

The Commonwealth next called Detective Mayer to testify. Detective Mayer has been a detective with the Allegheny County Police for twelve years. Detective Mayer was called out to investigate the shooting of Jeremy Fields on November 4, 2013. Upon arrival at the intersection of 19th and McClure Street, Detective [sic] Caterino[1] was already on the scene. Shortly after his arrival, Detective Caterino indicated there were several video

---

[1] James Caterino is a full-time detective with the Borough of Munhall Police Department and a part-time police officer with the Borough of West Homestead Police Department. He was on duty as a police officer regarding this matter. Accordingly, we will refer to him as Officer Caterino.

cameras on the exterior of the building. The owner of the building was there to take the detectives to an office where there was a small television for the surveillance system.

After viewing the video and Officer Cat[e]rino's observations, a Be On the Lookout, or "BOLO", was issued for the vehicle [Williams] was driving. Later that morning Detective Mayer, who had recently viewed the video, encountered a black Ford 500 sedan with a landau cloth roof traveling across the Rankin Bridge. The car was being driven by a black male, the sole occupant. The Detective got behind the vehicle and determined it was the same vehicle stopped earlier that morning by Officer Caterino.

Once marked cars arrived, a traffic stop was initiated and [Williams] stopped his car in the middle of the street; [Williams] was removed from the vehicle and placed in handcuffs; and was then transported to the County Headquarters and placed in a locked interview room.

Trial Court Opinion, 8/9/2017, at 8-11.

The video from Hruska Plumbing was not shown at the May 19, 2014 suppression hearing. The defense had been provided a copy of the video, but due to technical problems, had not viewed the video. It appears that the Commonwealth also was unable to view the video. The May 19, 2014 hearing was continued to July 9, 2014, at which time Lt. Rodney Steel testified regarding the traffic stop when Williams was arrested. The video was also not shown during the July 9, 2014 hearing.

After the two hearings, the suppression court found there was sufficient probable cause, based upon the testimony of Officer Caterino and Detective Mayer, to stop and arrest Williams. Specifically, Williams had been stopped in the general area of the crime shortly after the shooting, his was the only car in the area at that time, Williams was acting nervously, and Officer Caterino

- 4 -

recognized Williams' car as the car in the video.  At some time subsequent to the suppression court's ruling, the video became viewable.  After reviewing the video, Williams believed the video did not support Officer Caterino's assertion that he had stopped that car only moments before arriving at the scene of the crime.

Williams then sought reconsideration of the order denying suppression, asserting that the video contradicted Officer Caterino's testimony, thereby rendering the suppression court's determination unsupportable.  Specifically, he contends that without the identification of the car in the video as his car, there was insufficient probable cause to support the warrantless arrest.  The suppression court denied Williams' motion without a hearing.  ***See Order***, 11/20/2014.

Williams then filed a motion for recusal, asserting that the suppression judge had unfairly denied him the opportunity to be heard regarding all of the relevant evidence.  Williams also claimed this failure demonstrated an improper prejudice against him, making the suppression court's further participation in the case untenable.  The suppression court granted Williams' motion for recusal.  The case was thereafter transferred to Judge Ignelzi.

By letter, Williams renewed his motion for reconsideration of the denial of his motion to suppress evidence.  Judge Ignelzi instructed the parties to file briefs on the issue of the "Law of the Case Doctrine," also known more formally as the Coordinate Jurisdiction Rule.   This rule states:

"[J]udges of coordinate jurisdiction sitting in the same case should not overrule each other[']s decisions. This rule, known as the coordinate jurisdiction rule, is a rule of sound jurisprudence based on a policy of fostering the finality of pre-trial applications in an effort to maintain judicial economy and efficiency." Commonwealth v. Starr, 541 Pa. 564, 664 A2d, 1326, 1331 (1995) (citations and internal quotation marks omitted).

Departure from either the coordinate jurisdiction rule or the law of the case doctrine is allowed only in exceptional circumstances such as where there has been an intervening change in the controlling law, a substantial change in the facts or evidence giving rise to the dispute in the matter, or where the prior holding was clearly erroneous and would create a manifest injustice if followed.

[**Commonwealth v.**] **Rolan**, [964 A.2d 398] at 405, (Pa. Super. 2008) (citing **Starr**, **supra** at 1332).

**Commonwealth v. Hernandez**, 39 A.3d 406, 412 (Pa. Super. 2012).

Williams asserted the video was new evidence, unavailable at the time of the initial hearing, and therefore, Judge Ignelzi was allowed to reopen the record and consider the new evidence and issue a new order. The entire reason for opening the record and submitting new evidence was to re-litigate the issue. Specifically, Williams asked the court "to open the record of the suppression hearing, admit the video and after viewing the video reconsider the issue of whether the police had probable cause to arrest the defendant without a warrant, search and then seize his personal property and his vehicle on November 4, 2013." Williams' Memorandum of Law Supporting his Motion to Open the Record, 6/26/2015, at 14-15.

Subsequently, Judge Ignelzi granted Williams' motion and did exactly what Williams requested be done. Judge Ignelzi viewed the video several

times *in camera*. He offered to view the tape in the presence of the parties; however, the offer was declined. After viewing the video and reviewing the notes of testimony from the previous suppression hearings, Judge Ignelzi concluded Williams was incorrect and the video did not contradict Officer Caterino's testimony. Accordingly, he found no grounds upon which he could overrule the prior suppression order, and denied Williams' motion. Williams was tried by jury, and found guilty of first-degree murder. At trial, evidence obtained after Williams' arrest was admitted, including: other video surveillance from clubs and bars Williams and the victim had visited together that night as well as video of the victim and Williams travelling in the car that was ultimately viewed in the Hruska Plumbing video, gunshot residue found on Williams' hand and clothing, and the victim's blood on the rear of Williams' car.

Williams now claims the initial suppression court erred in finding probable cause existed supporting the warrantless arrest and that the initial suppression court erred in failing to open the record to view the video and reconsider the denial of the motion to suppress. Both of these claims rest upon the assertion that the video fails to support Officer Caterino's testimony. However, Williams has not challenged Judge Ignelzi's ruling that the video does not contradict Officer Caterino's testimony, thereby proving no grounds to overrule the denial of suppression. We will address Williams' second issue first.

Williams argues:

> The lynchpin underlying the suppression court's erroneous conclusion that probable cause supported Mr. Williams's arrest was Officer Caterino's testimony concerning his observations of a video. The video itself, however, 1) wasn't offered into evidence at the suppression hearing and 2) in fact contradicts Officer Caterino's testimony. Did the suppression court err in refusing to grant Mr. Williams's request to re-open the record so that it could receive and view the video?

Williams' Brief at 6.

This issue is easily disposed of: Williams sought and obtained relief from the denial of his motion for reconsideration and the court's failure to view the video when he sought recusal of the original suppression judge and obtained relief from Judge Ignelzi who opened the record and admitted and viewed the video. In essence, this claim is seeking relief from Judge Ignelzi's order, without actually challenging Judge Ignelzi's order. The entire purpose of Williams' petitions to Judge Ignelzi was to obtain relief from the prior ruling denying his motion for reconsideration. If Williams believed he was aggrieved by the results of the reconsideration he obtained from Judge Ignelzi, he was obliged to challenge Judge Ignelzi's order. He did not. Williams has not claimed Judge Ignelzi's determination that the video did not contradict Officer Caterino's testimony was an abuse of discretion or an error as a matter of law. Accordingly, Williams is not entitled relief on this claim.

Next, Williams argues the suppression court erred in determining there existed probable cause to arrest him without a warrant.

When considering the instant claim, we are mindful of the following:

> Our standard of review ... is whether the record supports the trial court's factual findings and whether the legal conclusions drawn therefrom are free from error. Our scope of review is limited; we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

> *Commonwealth v. Galendez*, 27 A.3d 1042, 1045 (Pa. Super. 2011) (*en banc*) (citation omitted), *appeal denied*, 615 Pa. 753, 40 A.3d 120 (2012). Additionally, "[a]ppellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pretrial motion to suppress." *Commonwealth v. Bush*, 166 A.3d 1278, 1281-82 (Pa. Super. 2017)(citation omitted), *appeal denied*, 176 A.3d 855. "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Id.* at 1282 (citation omitted).

*Commonwealth v. Koonce*, 190 A.3d 1204, 1211-12 (Pa. Super. 2018).

Additionally,

> Probable cause to arrest exists when the facts and circumstances within the police officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested. Probable cause justifying a warrantless arrest is determined by the totality of the circumstances.

> *Commonwealth v. Williams*, 941 A.2d 14, 27 (Pa. Super. 2008)(internal citations and quotation marks omitted). Furthermore, as succinctly explained by then Judge, now President Judge, Correale Stevens:[2] "[p]robable cause does not involve certainties, but rather 'the factual and practical considerations of everyday life on which reasonable and prudent

---

[2] Now President Judge Emeritus, Correale Stevens.

men act.' " ***Commonwealth v. Dommel***, 885 A.2d 998, 1002 (Pa. Super. 2005) (quoting ***Commonwealth v. Wright***, 867 A.2d 1265, 1268 (Pa. Super. 2005)). It is the facts and circumstances *within the personal knowledge of the police officer* that frames the determination of the existence of probable cause. *See, e.g.,* ***Commonwealth v. Lawson***, 454 Pa. 23, 27, 309 A.3d 391, 394 (1973)("Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that [an] offense has been committed.").

***Commonwealth v. Galendez***, 27 A.3d 1042, 1046 (Pa. Super. 2011).

As in the first issue, Williams believes and contends that the video evidence contradicted Officer Caterino's testimony that he recognized the car in the video as being Williams' car which Officer Caterino had stopped moments earlier. As noted above, Williams sought and obtained a judicial ruling regarding the video, but Judge Ignelzi, after viewing the video, did not agree with Williams' contention regarding the video as it related to Officer Caterino's testimony. Because Williams did not challenge that Order, we must reject his instant argument regarding the video.

We quote from the trial court opinion, jointly authored by Judges Todd and Ignelzi.

> In this case, the determination of whether reasonable suspicion and/or probable cause to arrest exists would be based upon the totality of the circumstances as known by Detective Mayer at the time [Williams] was taken into custody. This includes the information provided to Detective Mayer by Officer Caterino and Lt. Steele.
>
> Officer Caterino and Lt. Steele received a call for shots fired at approximately 3:30 a.m. on November 4, 2013, in a primarily residential and high crime area. They responded to the area and observed [Williams'] dark colored vehicle going westbound on 11th Avenue at a high rate of speed, then failing to stop at a stop sign at McClure and 11th Avenues.

Thereafter, Officer Caterino initiated a traffic stop and when he approached [Williams], he observed him to be sweating profusely and squirming in his seat. Officer Caterino further observed [Williams] to be wearing a red sweatshirt and gray sweatpants. Upon questioning from the officer. [Williams] indicated he was coming from the Trapper's Club in Homewood and proceeding to his home on 13th Street. Officer Caterino became suspicious due to the fact that the East 11th Avenue Extension is not accessible if [Williams] was truly traveling across the Rankin Bridge to 13th Street; the most direct route. In addition, Officer Caterino, who is familiar with the East 11th Avenue Extension, was aware based on his experience as a police officer, that the area is called "Cow's Hill" and is known as a place for discarding firearms.

After [Williams] consented to a search of his person and vehicle, which yielded no evidence, he was released. Officer Caterino and Lt. Steele continued onto the area where shots were fired; 19th and McClure Street. Video surveillance of the shooting was obtained from Hruska Plumbing, near the crime scene and Officer Caterino and Detective Mayer watched it. Officer Caterino immediately told Detective Mayer the he and Lt. Steele had just recently stopped [Williams] in a vehicle that looked just like the car in the video and he described what took place at the initial traffic stop.

Officer Caterino further informed the detective that the vehicle had a distinctive grayish stripe going horizontally across the car and it had a ragtop roof. Additionally, he noted that when the vehicle in the vehicle left the scene, it made a right and headed in the direction of Cow's Hill and the 11th Avenue extension.

Trial Court Opinion, at 23-25 (citations to the record omitted).

Our review of the certified record leads us to agree there was sufficient evidence of record to provide probable cause to arrest Williams. We find no error of law in the determination Officer Caterino had probable cause to believe Williams was the perpetrator. Accordingly, Williams is not entitled to relief on this issue.

- 11 -

Williams' final claim is the trial court erred in failing to dismiss a juror who saw him in the courthouse hall accompanied by several people, including a uniformed officer.

> Our standard of review when evaluating a claim of abuse of discretion by the trial court in refusing to strike a juror due to alleged bias is as follows:
>
>> The test for determining whether a prospective juror should be disqualified is whether he or she is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor, *Commonwealth v. Bighum*, 452 Pa. 554, 307 A.2d 255 (1973). It must be determined whether any biases or prejudices can be put aside on proper instruction of the court, *Commonwealth v. Drew*, 500 Pa. 585, 459 A.2d 318 (1983). A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct and answers to questions. *Commonwealth v. Colon*, 233 [223] Pa.Super. 202, 229 [299] A.2d 326 (1972). The decision on whether to disqualify is within the sound discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion, *Commonwealth v. Black*, 474 Pa. 47, 376 A.2d 627 (1977).
>
> *Commonwealth v. Akers*, 392 Pa.Super. 170, 192-93, 572 A.2d 746, 757 (1990).

*Commonwealth v. Michuck*, 686 A.2d 403, 407 (Pa. Super. 1996).

> Further, our Supreme Court has held:
>
> The thrust of appellant's argument is that it is inherently prejudicial for jurors to see a defendant in shackles; that this is so (it is said) because his appearance in shackles or handcuffs 'brands him as convicted in the state's eyes', *Commonwealth v. Keeler*, 216 Pa.Super. 193, 195, 264 A.2d 407, 409 (1970), thus

destroying the presumption of innocence which every defendant enjoys, and that the only way in which this inherent prejudice can be avoided is to declare a mistrial. The majority of the courts which have considered this issue have concluded to the contrary. In **United States v. Chrzanowski**, 502 F.2d 573 (3d Cir. 1974) the Third Circuit Court of Appeals held that '(t)he fact that jurors may briefly see a defendant in handcuffs is not so inherently prejudicial as to require a mistrial. **United States v. Rickus**, 351 F.Supp. 1386 (E.D.Pa. 1972), aff'd, 480 F.2d 919 (3d Cir. 1973); **United States v. Figueroa-Espinoza**, 454 F.2d 590 (9th Cir. 1972); **United States v. Hamilton**, 444 F.2d 81 (5th Cir. 1971); **United States v. Leach,** 429 F.2d 956 (8th Cir. 1970), cert. denied, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 151 (1971).' Our own Superior Court recently addressed this issue in the case of **Commonwealth v. McGonigle**, 228 Pa.Super. 345, 323 A.2d 733 (1974). There a unanimous court stated:

> 'It is settled law that a mere accidental observation of a defendant in handcuffs outside a courtroom by a juror does not, without more, require the granting of a mistrial, although a cautionary instruction by the trial court on the event will be appropriate. **Commonwealth v. DeMarco**, 225 Pa.Super. 130, 31 A.2d 341 (1973).'

**Commonwealth v. Evans**, 348 A.2d 92, 93-94 (Pa. 1975).

Here, Juror Number 3 reported to court officers he needed to speak with the trial judge. Williams had already reported to the court that he had passed a juror in the hallway, the night before, while he was in handcuffs and was accompanied by law enforcement. The juror was called into court for individual *voir dire*. The juror reported he asked to see the trial judge because he had seen Williams outside the courtroom. The juror was subjected to an extensive colloquy[3] regarding the incident. The juror testified he passed Williams the night before, and only realized it was Williams after they had

---

[3] **See** N.T. Trial, 4/5/2016, at 655-673.

- 13 -

passed, and because of the distinctive yellow shirt Williams had been wearing in court that day. The juror did not notice anything else about Williams. The juror did recognize that Williams appeared to be accompanied by several people, including a uniformed officer. Specifically, the juror testified:

> Juror[]: I really wasn't looking. I was trying to get to the elevator. No, I don't think – there may have been some of the people that were in the courtroom, but I wasn't – I'm not keeping an eye on them.
>
> The Court: When you say "some of the people in the courtroom," can you give me an idea? Do you mean like people who were in the back or anybody –
>
> Juror[]: People in the back, I guess. I mean, there were people. I assume they came from someplace, and they were in this room because he was coming out of this room. There was also a bailiff or what the right term is, a guard or whatever with him.
>
> The Court: Well, let me ask you this. You see how that gentleman over there is a sheriff?
>
> Juror[]: Sheriff, thank you.
>
> The Court: Do you recall seeing a sheriff with him?
>
> Juror[]: I saw someone in a uniform.
>
> The Court: You can't say what the uniform was?
>
> Juror[]: No. It's not too familiar.
>
> The Court: All right.
>
> Juror[]: It didn't even initially register that it was the defendant until I realized that yellow shirt, and that's when I started to turn around and I realized, oh, we just passed in the hall.
>
> The Court: And the fact you saw him with a sheriff, did that make you think of anything or give you any concern or anything?

- 14 -

Juror[]: No, not really.

[ADA]: I have nothing.

[Defense Counsel]: I have nothing.

N.T. Trial, 4/5/2016, at 662-63.

Although Williams objected to the juror remaining on the panel, following this inquiry, the trial court instructed the juror not to mention the incident or details of the *voir dire* to any of the other jurors. The trial court also instructed the juror to inform the court immediately if he remembered anything else, no matter how trivial. The juror understood the instruction and agreed. The juror made no further mention of the incident to the trial court.

The certified record demonstrates that the juror in question merely saw Williams in the hallway as they both left the court for the night. The juror saw Williams in the company of a sheriff, but drew no conclusions from that. He did not see Williams handcuffed. He was instructed not to mention the incident or the questioning to any of the other jurors and there is no indication he disobeyed that instruction. Finally, he was told to inform the court if he remembered anything else about his encounter with Williams, and he never again contacted the trial court.

Accordingly, the certified record shows the juror's contact with Williams was transient and incidental, at most. **Commonwealth v. Evans**, **supra**, instructs us that such contact, even where the juror sees the defendant in

- 15 -

handcuffs, which did NOT occur instantly, is insufficient to support the grant of a new trial.  Williams is not entitled to relief on this issue.

In light of the foregoing, we affirm.

Judgment of sentence affirmed.

Judge Musmanno joins this memorandum.  Judge Kunselman files a concurring and dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/31/2019